**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Dennis Scott STEWART, Stevie Hugh Stone, Christopher Liff Daniel, Defendants–Appellants.**

No. 92–6988.

United States Court of Appeals, Eleventh Circuit.

Oct. 3, 1995.

---

920

Kenneth J. Gomany, Birmingham, AL, for Christopher Liff Daniel.

Jack W. Selden, U.S. Atty., James A. Sullivan, Asst. U.S. Atty., Birmingham, AL, Jessica D. Silver, Gregory B. Friel, U.S. Dept. of Justice, Civ. Rights Div., Washington, DC, for U.S.

Before TJOFLAT, Chief Judge, CARNES, Circuit Judge, and JOHNSON, Senior Circuit Judge.

CARNES, Circuit Judge:

Dennis Scott Stewart, Stevie Hugh Stone, and Christopher Liff Daniel appeal their convictions for conspiracy to violate the civil rights of another, interference with the housing rights of another, and use of fire in the commission of a federal felony. Their three contentions are: that the district court improperly upheld the government's *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), challenge to one of their jury strikes, in violation of their right to exercise peremptory challenges; that their conviction on three separate counts related to the same incident violated their right not to be placed in jeopardy twice; and, that they were convicted based upon their beliefs and their association with the Ku Klux Klan, in violation of their First Amendment rights. For the reasons that follow, we reject all of their contentions and affirm their convictions.

## I. BACKGROUND

In 1991, Linda and Isaiah Ruffin, who are both black, moved their family into a home they had purchased near Horton, a small Marshall County community. The family included their two young daughters and Mrs. Ruffin's 96-year-old aunt. They were some of the first blacks to live in that area, and the young Ruffin girls were among the first black children to attend the local public school in the nearby community of Douglas.

The presence of the Ruffins in the virtually all-white community agitated the membership of the Alabama Empire Knights of the Ku Klux Klan ("Klan"). During the group's

J. Louis Wilkinson, Wilkinson & Vinson, Birmingham, AL, for Dennis Scott Stewart.

C. Tommy Nail, McAbee, Nail & Ragsdale, Birmingham, AL, for Stevie Hugh Stone.

meetings, Stevie Hugh Stone, a Klan leader, complained that "niggers" had moved into an all white community where they were not wanted. Christopher Liff Daniel and Dennis Scott Stewart were also Klan members.

At a mid-March 1991 meeting held at Daniel's home, some Klan members, including these three defendants, agreed to burn a cross in the Ruffins' yard. To create an alibi, they planned to attend a March 23, 1991, Klan rally in Sommerville, Alabama, and then to slip away from that rally to undertake the cross burning. On the prearranged date, Daniel, Stone, and Stewart attended the rally. After leaving the rally, those three, along with four other Klan members, Junior Whitlock, Marion Lynn Gibson, J.P. Warren, and Thomas Murphree, arrived at Daniel's trailer.[1] Stone informed Warren that the group was "fixing to go burn a cross" and would do it "over at those niggers that had moved in." He said that Warren would light the cross as a new Klan member. Daniel retrieved a cross wrapped in burlap with a pointed tip; they loaded it and a can of diesel fuel into Murphree's pickup truck.

Around 11:30 p.m. or midnight, the seven men left for the Ruffins' home in the pickup truck and another vehicle. After stopping to douse the cross with the diesel fuel, they arrived at the Ruffins' property. Warren stuck the cross into the ground in the Ruffins' yard about twelve to fifteen feet from the Ruffins' front door, and he lit it. The Ruffins and two guests were in the house. After hearing a noise, Mr. Ruffin retrieved his gun and went outside to investigate. When he saw the men burning the cross, he began firing his gun. Warren fled in the truck, and the burning cross tumbled over onto the lawn. When Mr. Ruffin stopped shooting, Whitlock drove the second vehicle in front of the Ruffins' home, and from that vehicle Stone fired into the air at least three shots from a .22 caliber pistol. Stone told Whitlock that Stone had "scared the hell out of that guy [Mr. Ruffin]."

The three counts of the resulting indictment that are relevant to this appeal charged

that Stone, Stewart, and Daniel knowingly and willfully: conspired to deprive the Ruffins of their civil right to "own, hold and occupy a dwelling without injury, intimidation, and interference because of their race and color," in violation of 18 U.S.C. § 241; attempted to and actually did "injure, intimidate, and interfere" with the Ruffins' occupation of a dwelling because of their race, in violation of 42 U.S.C. § 3631(a); and, used fire during the commission of a federal felony, their § 241 conspiracy, in violation of 18 U.S.C. § 844(h)(1).

## II. DISCUSSION

### A. THE *BATSON* ISSUES

The first issue the defendants raise involves the district court's action in sustaining the government's *Batson* challenge to one of their peremptory strikes. The result of the court's action was that a black female the defendants had attempted to keep off the jury served on it. Arguing that the court's action was not justified under *Batson,* the defendants contend that it was an improper interference with their right to exercise their peremptory strikes. We do not think so, because we believe that the district court's action in sustaining the government's objection to the peremptory strike was proper under *Batson.*

### 1. *The Jury Selection Facts*

The jury was struck from a group of thirty venire members, four of whom were black. The defendants used three of their peremptory strikes to remove three of the four blacks from the jury. After all of the strikes of both sides had been exercised, one black female, Ms. Carter, was left on the jury. Before the jury was impaneled, however, the government objected that the defendants' strikes of the three other black venire members were racially discriminatory. After requiring the defendants to explain those three strikes, the district court found that two of the three strikes had been sufficiently race neutral in motivation but that the defendants

---

1. Whitlock, Gibson, Warren, and Murphree have all pleaded guilty to some offense related to this cross burning.

had stricken Ms. Robertson because of her race, and it ordered her seated on the jury.

Because of the mechanics of the process used to select the jury, the district court's action in returning Ms. Robertson to the jury had the ironic effect of displacing Ms. Carter from it. Thus, the net result of the court's action sustaining the government's *Batson* challenge to the strike of Ms. Robertson was that one black female replaced another on the jury.

### 2. *The* Batson *Inquiry*

In *Batson,* the Supreme Court held that a prosecutor's use of peremptory strikes in even a single case to remove blacks from the jury on account of their race violates the Equal Protection Clause. *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). That principle was extended to defense peremptory strikes in *Georgia v. McCollum,* 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992). The Supreme Court has established a framework for evaluating *Batson* challenges. "[I]f the State demonstrates a prima facie case of racial discrimination by the defendants, the defendants[ ] must articulate a racially neutral explanation for peremptory challenges." *Id.* at 59, 112 S.Ct. at 2359. Once the *Batson* challenger demonstrates a prima facie case of discrimination and the opposing party offers an explanation for the challenged strikes, "the trial judge determines, in light of all the facts and circumstances, whether the [*Batson* challenger] has established the existence of purposeful discrimination." *United States v. Jiminez,* 983 F.2d 1020, 1023 (11th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 330, 126 L.Ed.2d 276 (1993).

■ When we review the resolution of a *Batson* challenge, we give great deference to the district court's finding as to the existence of a prima facie case. *See United States v. Moore,* 895 F.2d 484, 486 (8th Cir.1990) ("The trial judge ... is in by far the best position to make the *Batson* prima facie case determination.... *De novo* review of the record by this Court would be inappropriate...."); *see also Batson,* 476 U.S. at 97, 106 S.Ct. at 1723. Once past the prima facie case step, the district court's determination concerning the actual motivation behind each challenged strike amounts to pure factfinding, and for that reason we will reverse the district court's determination only if it is clearly erroneous. *See Hollingsworth v. Burton,* 30 F.3d 109, 112 (11th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 944, 130 L.Ed.2d 888 (1995); *United States v. Diaz,* 26 F.3d 1533, 1542 (11th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 952, 130 L.Ed.2d 895 (1995).

■ We reject the defendants' suggestion that a stricter standard of appellate review should apply to cases where the *Batson* issue involves defense strikes instead of prosecution strikes. A defendant's misuse of the power of the court to deny a citizen her right to participate on a jury because of race is as reprehensible as a prosecutor's, and the effect on the excluded juror is the same. Moreover, a district court's superior ability as a *Batson* factfinder stems from two advantages it has over an appellate court: the positional advantage of being there among the facts as they unfold, and of seeing and hearing the explanations as they are given; and the experiential advantage of regularly being in the business of factfinding, which an appellate court is not. *See Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564, 574, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985) ("The rationale for deference to the original finder of fact is not limited to the superiority of the trial judge's position to make determinations of credibility. The trial judge's major role is the determination of fact, and with experience in fulfilling that role comes expertise."). Because neither of those two advantages vary depending upon which side has exercised the peremptory strike being challenged, the standard of review does not vary, either.

■ Under the *Batson* framework, the district court first determines whether the party challenging the peremptory strikes has established a prima facie case of discrimination. If so, the court requires the striking party to explain its reasons for the strikes in question, and then proceeds to determine whether those strikes were based upon the venire members' race or instead upon race-

neutral reasons. Our review of the district court's action in sustaining the government's challenge to the defendants' strike of Ms. Robertson follows that same route. First we review the district court's prima facie case finding, and then we review its finding that the defense strike of Ms. Robertson was based upon her race.

### a. *The Prima Facie Case*

The defendants argue that the government failed to establish a prima facie case of a *Batson* violation, and the government argues that because the defense was required to and did offer explanations for its strikes the prima facie case issue is moot. We disagree with both the government and the defendant—the prima facie case issue is not moot, but the government did make the necessary showing.

■ The government's argument that the prima facie case issue becomes moot once the striking party proffers reasons for the challenged strikes is based upon the following language from *Hernandez v. New York,* 500 U.S. 352, 359, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991) (plurality opinion): "Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." For a number of reasons, we do not feel compelled by that language to hold that the prima facie showing is moot in this case. First, that language from *Hernandez* is from a plurality opinion, and plurality opinions do not bind this Court. *E.g., Foster v. Board of Sch. Comm'rs of Mobile County, Ala.,* 872 F.2d 1563, 1569 n. 8 (11th Cir.1989). Second, the language is dictum, at least for the purpose the government would use it. In *Hernandez,* the striking party, the prosecutor, "defended his use of peremptory strikes without any prompting or inquiry from the trial court," with the result that "the trial court had no occasion to rule that [the defendant] had or had not made a prima facie showing of intentional discrimination." 500 U.S. at 359, 111 S.Ct. at 1866. In this case, by contrast, the district court did have occasion to rule on

whether the objecting party had made a prima facie showing of racial discrimination, and it did require the striking party to explain the reasons for the strikes.

■ Furthermore, the Supreme Court ruled in *Hernandez* that the trial court had not committed clear error by concluding that the peremptory strikes in question had not been used in a racially discriminatory manner and by rejecting the *Batson* challenge. *Id.* at 369–70, 111 S.Ct. at 1871–72. Thus, the Supreme Court did not decide the question we face in this case: when a trial court has found that a prima facie showing of racial discrimination in the use of peremptory strikes has been made, has required the striker to explain the challenged strikes, and has disallowed one or more strikes, may an appellate court uphold the trial court's action without reviewing its prima facie case determination. We hold the answer is no.

In *Batson* and its progeny, the Supreme Court has repeatedly described the prima facie showing as a hurdle the party making a *Batson* challenge must clear before the striker is required to proffer any explanation for the challenged strikes. *E.g., J.E.B. v. Alabama ex rel. T.B.,* —— U.S. ——, ——, 114 S.Ct. 1419, 1429, 128 L.Ed.2d 89 (1994) ("As with race-based *Batson* claims, a party alleging gender discrimination must make a prima facie showing of intentional discrimination before the party exercising the challenge is required to explain the basis for the strike."); *McCollum,* 505 U.S. at 59, 112 S.Ct. at 2359 ("Accordingly, if the State demonstrates a prima facie case of racial discrimination by the defendants, the defendants must articulate a racially neutral explanation for peremptory challenges."); *Edmonson v. Leesville Concrete Co.,* 500 U.S. 614, 629–31, 111 S.Ct. 2077, 2088, 114 L.Ed.2d 660 (1991) ("It remains to consider whether a prima facie case of racial discrimination has been established in the case before us, requiring Leesville to offer race-neutral explanations for its peremptory challenges."); *Hernandez,* 500 U.S. at 358, 111 S.Ct. at 1866 ("First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race.... Second, if the requisite showing has been made,

the burden shifts to the prosecutor...."); *Batson*, 476 U.S. at 97, 106 S.Ct. at 1723 ("Once the defendant makes a prima facie showing, the burden shifts to the State to come forward with a neutral explanation for challenging black jurors.").

To ignore the prima facie showing requirement when reviewing a trial court's *Batson* holding would be to ignore the Supreme Court's repeated descriptions of that requirement as an integral part of any *Batson* analysis. No party challenging the opposing party's use of a peremptory strike—whether that party be the government, a criminal defendant, or a civil litigant—is entitled to an explanation for that strike, much less to have it disallowed, unless and until a prima facie showing of racial discrimination is made. Accordingly, unless it concludes that a prima facie showing was made, an appellate court should neither reverse a trial court's action refusing to disallow challenged strikes, nor should it affirm a trial court's action disallowing strikes. No decision of the Supreme Court or of this Court is inconsistent with that principle, which flows directly from the language of *Batson* and its progeny.

■ We turn now to a review of the district court's prima facie case determination in this case, a determination to which we owe great deference. *See* p. 924, above. After the government made the *Batson* challenge, the district court noted that all but one black juror had been stricken by the defendants, and later explained: "Let me say that I think the number of strikes against the members of the black race raises an inference at least that the reasons were—that they were struck because of their race...." In *Batson*, the Court explained that in order to determine whether a prima facie case has been established:

> the trial court should consider all relevant circumstances. For example, a "pattern" of strikes against black jurors included in the particular venire might give rise to an inference of discrimination. Similarly, the [party's] questions and statements during *voire dire* examination and in exercising his challenges may support or refute an inference of discriminatory purpose. These examples are merely illustrative.

We have confidence that trial judges, experienced in supervising *voire dire*, will be able to decide if the circumstances concerning the [party's] use of peremptory challenges creates a prima facie case of discrimination against black jurors.

*Batson*, 476 U.S. at 96–97, 106 S.Ct. at 1723. Although no particular number of strikes against blacks automatically indicates the existence of a prima facie case, here the defendants struck seventy-five percent of the black venire members, which amounted to all but one of them. Moreover, *Batson* teaches that a prima facie case determination should include an examination of "all relevant circumstances." Among the "relevant circumstances" is the subject matter of the case being tried. Here the defendants were being prosecuted for a racially motivated hate crime against blacks.

■ The defendants argue that the district court's finding that a prima facie showing had been made is error because: the district court ultimately allowed two of the three challenged strikes; the disallowed strike did not alter the racial composition of the jury, but instead merely replaced one black juror with another; and, the defendants' failure to strike one of the four black jurors should have prevented any prima facie case determination. We address each of these arguments in turn. To begin with, once a prima facie showing has been made and explanations for the challenged strikes have been required, a trial court's ruling on the validity of those explanations does not retroactively affect the correctness of its prima facie case determination. *Batson* and its progeny prescribe an orderly step-by-step process for resolving issues involving allegations of racial discrimination in the use of peremptory strikes, and that process is linear, not circular. The trial judge should not revisit the first step in the process after each additional step, nor will we.

■ With regard to the defendants' second argument, it is true that application of *Batson* did not ultimately alter the racial composition of the jury in this case, but that fact does not undermine the validity of the district court's earlier prima facie case determination. As we have explained, the prima

926

facie case determination is the self-contained, first step in a one-direction process, which is not affected by events or determinations that occur thereafter. Moreover, any implication that there was no point in applying *Batson* in this case because the numbers did not change is wrong. *Batson* is not about numbers *per se.* It is about ending racial discrimination against people such as Ms. Robertson who, if the district court had not acted, would have been excluded from the jury because of her race. *See McCollum,* 505 U.S. at 48, 112 S.Ct. at 2353 ("While an individual juror does not have a right to sit on any particular petit jury, ... he or she does possess the right not to be excluded from one on account of race." (internal quotation marks, brackets, and citation omitted)).

 The defendants' third and final argument on this issue is that a prima facie case did not exist because they did not strike one black venire member, Ms. Carter, who would have served on the jury had Ms. Robertson not displaced her. We have said before that "although the seating of blacks on the jury is a significant fact, it does not bar a finding of racial discrimination." *Cochran v. Herring,* 43 F.3d 1404, 1412 (11th Cir.1995).

We hold that the district court did not err in finding that the government had made the necessary prima facie showing, requiring the defendants to justify each of the challenged strikes on race-neutral grounds.

b. *The Defendants' Proffered Explanations*

 The district court credited the defendants' explanations for two of their three strikes against black venire members but did not credit their explanations for the third strike, the one used against Ms. Robertson. The defendants first proffered that they had struck Ms. Robertson because they, who were from rural Alabama, wanted to exclude urbanites from the jury. Ms. Robertson resided in metropolitan Birmingham. Although this would have been a race-neutral reason, we are not surprised that the district court was skeptical about it being the real reason for the strike. As the district court found, several unstruck white jurors were from metropolitan areas or did not reside in

the part of Alabama close to the defendants' homes.

Second, the defendants proffered that juror Robertson was undesirable from their perspective, because "she works for Blue Cross, and she had a math degree which tells me she's an—my experience with math majors and people who deal with exact figures is that they need exact answers, and they intend [sic] to get hung up when dealing with generalities and things such as human error." However, as the district court noted, the defendants failed to explain adequately why they did not strike white venire members who worked with numbers, such as one who was a bank accountant, and another who worked as an adjustor for Ford Motor Credit.

 We recognize that failing to strike a white juror who shares some traits with a struck black juror does not itself automatically prove the existence of discrimination. *See Hollingsworth v. Burton,* 30 F.3d 109, 112–13 (11th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 944, 130 L.Ed.2d 888 (1995). But we are also mindful that we review the district court's findings about whether a particular strike was racially motivated only for clear error, and "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson,* 470 U.S. at 574, 105 S.Ct. at 1511. In this case the district court conducted a thorough examination of the proffered reasons and did not commit clear error in finding that the real reason the defendants struck Ms. Robertson was her race.

Because the district court did not err in finding that the government had made a prima facie showing of racial discrimination in the defendants' use of their peremptory strikes, and because it did not err in finding that Ms. Robertson was struck because of her race, we reject the defendants' contention that the court erred in disallowing that strike.

B. THE DOUBLE JEOPARDY ISSUES

The defendants contend that because they were charged with, convicted of, and pun-

ished for three counts which essentially involved the same conduct—the cross burning—their constitutional right against being placed in jeopardy twice was violated. They rely upon the Double Jeopardy Clause's protection "'against multiple punishments for the same offense.'" *Albernaz v. United States*, 450 U.S. 333, 343, 101 S.Ct. 1137, 1145, 67 L.Ed.2d 275 (1981) (quoting *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969), *overruled on other grounds, Alabama v. Smith*, 490 U.S. 794, 109 S.Ct. 2201, 104 L.Ed.2d 865 (1989)).

The Double Jeopardy Clause does not bar cumulative punishments stemming from a single incident when Congress intends to prescribe cumulative punishments. In the cumulative punishment context, the "interest that the Double Jeopardy Clause seeks to protect" is one "'limited to ensuring that the total punishment did not exceed that authorized by the legislature.'" *Jones v. Thomas*, 491 U.S. 376, 381, 109 S.Ct. 2522, 2525, 105 L.Ed.2d 322 (1989) (quoting *United States v. Halper*, 490 U.S. 435, 450, 109 S.Ct. 1892, 1903, 104 L.Ed.2d 487 (1989)); *accord Garrett v. United States*, 471 U.S. 773, 778–83, 105 S.Ct. 2407, 2411–13, 85 L.Ed.2d 764 (1985); *Ohio v. Johnson*, 467 U.S. 493, 499–500, 104 S.Ct. 2536, 2540–41, 81 L.Ed.2d 425 (1984); *Missouri v. Hunter*, 459 U.S. 359, 366–69, 103 S.Ct. 673, 678–79, 74 L.Ed.2d 535 (1983); *United States v. Kaiser*, 893 F.2d 1300, 1304 (11th Cir.1990) ("If the statutes under which the defendant was sentenced specifically authorize cumulative punishments for the same offense, a court may impose cumulative punishment without running afoul of the Double Jeopardy Clause."). "The purpose is to ensure that sentencing courts do not exceed, by the device of multiple punishments, the limits prescribed by the legislative branch of government, in which lies the substantive power to define crimes and prescribe punishments." *Jones*, 491 U.S. at 381, 109 S.Ct. at 2525–26.

In light of the well-established principle that Congress may intentionally prescribe multiple punishments for the same conduct, our task is to determine whether Congress manifested such an intent for the three statutory provisions under which the defendants were convicted. Section 241 punishes conspiracies to deprive citizens of federally protected rights, while § 3631 punishes the substantive offense of interfering or attempting to interfere with housing rights on the basis of race. "It has been long and consistently recognized by the Court that the commission of the substantive offense and a conspiracy to commit it are separate and distinct offenses.... And the plea of double jeopardy is no defense to a conviction for both offenses." *Pinkerton v. United States*, 328 U.S. 640, 643, 66 S.Ct. 1180, 1182, 90 L.Ed. 1489 (1946); *see also United States v. Felix*, 503 U.S. 378, 390, 112 S.Ct. 1377, 1384–85, 118 L.Ed.2d 25 (1992). In *Iannelli v. United States*, 420 U.S. 770, 95 S.Ct. 1284, 43 L.Ed.2d 616 (1975), the Supreme Court explained:

> The historical difference between the conspiracy and its end has led this Court consistently to attribute to Congress "a tacit purpose—in the absence of any inconsistent expression—to maintain a long-established distinction between offenses essentially different,—a distinction whose practical importance in the criminal law is not easily overestimated."

*Id.* at 779, 95 S.Ct. at 1290–91 (quoting *United States v. Rabinowich*, 238 U.S. 78, 88, 35 S.Ct. 682, 685, 59 L.Ed. 1211 (1915)); *see also Callanan v. United States*, 364 U.S. 587, 593–94, 81 S.Ct. 321, 325, 5 L.Ed.2d 312 (1961). Neither § 241 nor § 3631 contains an "inconsistent expression" indicating a Congressional intent to bar the simultaneous application of the two provisions.

Thus we hold that the defendants can be convicted and punished both under § 241 for a conspiracy to violate the victims' civil rights and under § 3631 for the actual threat to the victims' right to remain in their domicile regardless of their race. *Cf. Catala Fonfrias v. United States*, 951 F.2d 423 (1st Cir.1991) (explaining that Congress intended to allow simultaneous prosecutions for violations of § 241 and 18 U.S.C. § 242, which punishes the substantive offense of violating a person's Constitutional rights under the color of law), *cert. denied*, —— U.S. ——, 113 S.Ct. 105, 121 L.Ed.2d 64 (1992).

 Nor does the Double Jeopardy Clause bar the defendants' additional conviction and punishment for violation of § 844(h)(1). In that statutory provision itself, Congress unambiguously authorized cumulative punishment. When a defendant uses fire to commit a felony, the statute mandates that: *"in addition* to the punishment provided for such felony, [the defendant shall] be sentenced to imprisonment for 5 years but not more than 15 years." 18 U.S.C.A. § 844(h)(1) (West Supp.1995) (emphasis added). We agree with the Eighth Circuit, that as § 844(h)(1)'s language "makes plain, Congress intended that the crimes of using fire to commit a felony and the felony itself may be punished cumulatively...." *United States v. Shriver,* 838 F.2d 980, 982 (8th Cir.1988).[2]

 The defendants seek refuge in the holding of *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932), that "the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact which the other does not."[3] But when the relevant statutes on their face indicate a clear legislative intent to allow multiple punishments, we need not engage in a *Blockburger* analysis, because we must give effect to that legislative intent. *See Garrett,* 471 U.S. at 779, 105 S.Ct. at 2411; *Albernaz,* 450 U.S. at 340, 101 S.Ct. at 1143. We do note that the simultaneous application of these three particular statutes would satisfy the *Blockburger* test, anyway, because each statute requires an additional element of proof. Section 3631 requires proof that the defendants intended to threaten the family to interfere with their housing

rights. While setting the cross on fire, given the symbolism of Klan cross burnings, may have been one indicia of that intent, the actual lighting of the fire was unnecessary to a § 3631 conviction. On the other hand, the use of fire was necessary to the § 844(h) conviction. And, the § 241 conspiracy count required the additional proof that the defendants conspired together to commit the substantive offense. For these reasons, the cumulative punishments the defendants received under the three applicable statutes do not violate double jeopardy principles.

## C. THE FIRST AMENDMENT ISSUES

 The defendants contend that their conviction and punishment for burning a cross on the Ruffins' front lawn violated their First Amendment rights. Relying primarily upon the Supreme Court's decision in *R.A.V. v. City of St. Paul, Minn.,* 505 U.S. 377, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992), they argue that they are being punished for a symbolic expression of their beliefs and for their association with the Ku Klux Klan. We disagree. The defendants have been convicted and are being punished for engaging in an activity—threatening, intimidating, and interfering with the rights of the Ruffins and using fire to do so—which the government may regulate without violating the First Amendment. Beyond their general reliance on *R.A.V.,* the defendants are imprecise as to the specifics of their First Amendment contention. Nonetheless, we will briefly explain why the First Amendment does not bar their convictions and sentences on any of the usual grounds: first, the statutes under which the defendants were prosecuted, 18 U.S.C. § 241,[4] 18 U.S.C.

---

2. This reading of § 844(h)(1) comports with our resolution of double jeopardy concerns relating to other statutes with similar language. For example, we have held that a defendant's punishment both for committing a bank robbery using a dangerous weapon and also for using and carrying firearms during the robbery, does not violate the Double Jeopardy Clause. *United States v. Ricks,* 817 F.2d 692, 698–99 (11th Cir.1987); *see also United States v. Martin,* 961 F.2d 161, 163–64 (11th Cir.), *cert. denied,* ⸺ U.S. ⸺, 113 S.Ct. 271, 121 L.Ed.2d 200 (1992).

3. The defendants also cite *Grady v. Corbin,* 495 U.S. 508, 521, 110 S.Ct. 2084, 2093, 109 L.Ed.2d

548 (1990), for the proposition that "the Double Jeopardy Clause bars any subsequent prosecution in which the government, to establish an essential element of an offense charged in that prosecution, will prove conduct that constitutes an offense for which the defendant has already been prosecuted." However, *United States v. Dixon,* ⸺ U.S. ⸺, ⸺, 113 S.Ct. 2849, 2860, 125 L.Ed.2d 556 (1993), overruled *Grady* and discarded that test.

4. As applied to these defendants, § 241 provided:
 If two or more persons conspire to injure, oppress, threaten, or intimidate any person in any State ... in the free exercise or enjoyment

§ 844(h),[5] and 42 U.S.C. § 3631,[6] are facially valid; second, the statutes are not unconstitutionally vague or overbroad; and, third, the statutes are not unconstitutional as applied in this case. We will then explain why prosecutorial comments about the defendants' racial animus and Klan membership were permissible, and why the district court's comments on the same subjects at sentencing were also permissible.

### 1. The Facial Validity Issue

■■■ Contrary to the defendants' assertion, the Supreme Court's *R.A.V.* decision did not preclude any and all regulation of cross burning. *See R.A.V.*, 505 U.S. at 395–96, 112 S.Ct. at 2550. The Supreme Court's subsequent decision in *Wisconsin v. Mitchell*, — U.S. ——, 113 S.Ct. 2194, 124 L.Ed.2d 436 (1993), clearly limited the impact of *R.A.V.* on statutes, like the ones at issue here, which are aimed at conduct as opposed to expression. In *Mitchell*, the Supreme Court upheld a Wisconsin statute that permitted penalty enhancement for racially motivated crimes. In doing so, the Supreme Court recognized that a statute aimed at constitutionally unprotected conduct may single out a particular motive, including racial animus, for punishment without offending the First Amendment. *Id.* at —— – ——, 113 S.Ct. at 2200–01. The statutes under which the defendants were prosecuted also target unprotected conduct—willful interference with housing rights, conspiracy, and the use of fire. So although § 3631 specifically prohibits intimidation based on race, because such intimidation itself is unprotected conduct, under *Mitchell* the statute is not facially invalid.

### 2. The Overbreadth and Vagueness Issue

■■ The three statutory provisions also survive First Amendment scrutiny under the vagueness and overbreadth doctrines. For the reasons stated in their opinions, we agree with the Eighth and Ninth Circuits which have already rejected vagueness and overbreadth challenges to §§ 241 and 3631. *See United States v. McDermott*, 29 F.3d 404, 410 (8th Cir.1994) (holding § 241 not vague or overbroad); *United States v. J.H.H.*, 22 F.3d 821, 828 (8th Cir.1994) (holding §§ 241 and 3631 not vague); *United States v. Gilbert*, 813 F.2d 1523, 1530–31 (9th Cir.) (holding § 3631 not vague or overbroad), *cert. denied*, 484 U.S. 860, 108 S.Ct. 173, 98 L.Ed.2d 127 (1987). The same result applies to § 844. It is not vague, because the language provides clear notice that using fire during the course of committing a felony is a crime; it is not overbroad, because it applies only to those fires used during the commission of federal felonies.

### 3. The As Applied Issues

■■■ In *R.A.V.* itself, the Court recognized that there were legitimate ways to regulate cross burning: "Let there be no mistake about our belief that burning a cross in someone's front yard is reprehensible. But St. Paul has sufficient means at its disposal to prevent such behavior...." *R.A.V.*, 505 U.S. at 396, 112 S.Ct. at 2550. The question here is whether application of these three federal statutes is a permissible means of preventing such behavior.

The act of burning the cross in the Ruffins' front yard was an expression of the defendants' hatred of blacks, just as the act of

of any right or privilege secured to him by the Constitution or laws of the United States ...
 They shall be fined under this title or imprisoned not more than ten years, or both....
18 U.S.C.A. § 241 (West Supp.1995).

5. Section 844(h) provides that whoever:

uses fire or an explosive to commit any felony which may be prosecuted in a court of the United States, ...

 . . . . .

... shall, in addition to the punishment provided for such felony, be sentenced to imprisonment for 5 years but not more than 15 years.

18 U.S.C.A. § 844(h) (West Supp.1995).

6. As applied to the defendants, § 3631 provides that:
 Whoever ... by force or threat of force willfully injures, intimidates or interferes with, or attempts to injure, intimidate or interfere with—
 (a) any person because of his race, color, religion, sex, handicap ..., familial status ..., or national origin and because he is or has been ... purchasing, [or] occupying ... any dwelling ...
 shall be fined under this subchapter or imprisoned not more than one year, or both....
42 U.S.C.A. § 3631 (West 1994).

killing is sometimes an expression of a murderer's hatred of the victim. Because we punish the act and not the opinion or belief which motivated it, the cross burning in this case was not protected by the First Amendment, just as a murder would not have been protected in similar circumstances. Notwithstanding the fact that some Klan cross burnings may constitute protected expression, these defendants did not burn their cross simply to make a political statement. The evidence clearly shows that the defendants intended to threaten and to intimidate the Ruffins with this cross burning. Klansman Warren testified that the Klan burns a cross in someone's yard "just to intimidate them," while Murphree added that the cross was intended to force the Ruffins to move out of their home. Even Daniel himself admitted at trial that a cross burning in someone's yard "could probably be perceived as a threat." Section 3631's "requirement of intent to intimidate serves to insulate the statute from unconstitutional application to protected speech." *Gilbert,* 813 F.2d at 1529; *see also Munger v. United States,* 827 F.Supp. 100, 105 (N.D.N.Y.1992) ("[S]ection 3631(b)(1) ... is a content-neutral, narrowly tailored prohibition against the exact evil it seeks to prevent—namely, the willful and violent interference with housing on a discriminatory basis. The requirement of intent serves to insulate the statute from unconstitutional application to protected speech." (citing *United States v. Wood,* 780 F.2d 955, 961 (11th Cir.), *cert. denied,* 476 U.S. 1184, 106 S.Ct. 2920, 91 L.Ed.2d 549 (1986))).

### 4. *The Prosecutorial Comments*

■ Pointing to prosecutorial comments about the Klan and about the defendants' racist attitudes, the defendants also contend that the government convicted them "by putting the [d]efendants' ideology on trial." The prosecutorial comments in question were about evidence of the defendants' racial animus which was relevant not only as to motive but also to prove an element of the crime. To secure a conviction under § 3631, the government needed to prove that the defendants' intended to interfere with the Ruffins' housing rights because of their race. The

fact that evidence of this intent and the defendants' ultimate attack on the Ruffins is linked to Klan activities did not bar its presentation to the jury, nor did it make prosecutorial comments about that evidence improper. "The First Amendment ... does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent. Evidence of a defendant's previous declarations or statements is commonly admitted in criminal trials subject to evidentiary rules dealing with relevancy, reliability, and the like." *Mitchell,* —— U.S. at ——, 113 S.Ct. at 2201.

### 5. *The Judge's Comments at Sentencing*

■ At sentencing, the district court judge expressed her concern about the racial hatred preached by the Klan and her hope that the defendants would change their racist attitudes. Before imposing sentence on Stone, the court made the following remarks:

Mr. Stone, I have some things I'd like to say to you prior to imposing sentence. This case reminds us that racism in America is not over. During the trial, there was an initial attempt to portray this as some sort of a prank based in part apparently on what was said to Ms. Ruffin by a sheriff's deputy when he responded to her call. This was no prank. This was an intentional act of discrimination. And in my opinion, you were the instigator of this act of intimidation and the leader of it.

You were the head of the Klan. The Grand Dragon was your title. I don't know if it's still your title or not. For years in America, the Klan has stood for intolerance, bigotry, hatred. It's been at the core and the center of racial violence in America. The Ku Klux Klan has been responsible—and I want you to think about [ ] what the Ku Klux Klan has been responsible for—for shooting, mutilating, the lynching of innocent black American citizens. It's been responsible for bombings and burnings of black churches. It's been responsible for the murders of civil rights workers.

You and your wife were both members of the Klan, and you have two children. I don't need to tell you this, but children

aren't born with prejudice. It's a wonderful thing to think about that children are born in this world with—they don't have any prejudices. Children learn prejudice. I hope that this event will not cause your sons to believe somehow that the Ruffins or someone else is responsible for the sentence that you will now receive. I hope somehow that they can recognize that America is great because of our cultural diversity. Our diversity in America is a strength, not a weakness.

As you know, I'm sure it's been explained to you at great length by Mr. Nail, the guidelines, of course, enacted by Congress are dictating in large part the sentence that you're going to be receiving today. If it were within my power, it would be the wish of the Court to erase any racial hatred that you or your family members or your friends might still harbor. Of course, I'm a federal judge and have a lot of power, but that's not one of the things that's within my power. So because I'm not able to do that, I just have to hope that one day those feelings that you apparently feel towards members of the black race will change. And I hope the feelings of those in your community will change that support your beliefs, because racism cannot thrive in a community that says we won't tolerate these attitudes, and we won't tolerate these types of actions.

We live in a country, Mr. Stone, where people have the right to live where they want to and not be interfered with or intimidated because of their race or color. And you didn't recognize that to be a fact, and now you're going to suffer the consequences.

Although the details varied somewhat, the court made similar remarks before sentencing Daniel and Stewart.

The defendants complain about the court's remarks and argue that their sentences were affected by their ideology. The record shows, however, that each defendant received a sentence at the lower end of the guideline range with no upward departure. Thus, the record reflects that the defendants were not sentenced based upon their membership in the Klan or their racial beliefs, but instead based upon their crimes and the relevant United States Sentencing Guidelines. *Cf. United States v. Rosenberg*, 806 F.2d 1169, 1180 (3d Cir.1986) (finding "the record, and in particular, the sentencing minutes, do not justify amici's concern that the court imposed the sentences as a punishment for the defendants' exercise of their [F]irst [A]mendment rights."), *cert. denied,* 481 U.S. 1070, 107 S.Ct. 2465, 95 L.Ed.2d 873 (1987).

Even if the district court had factored the racist attitudes behind the crime into the sentences imposed, we seriously doubt that it would have been error. In *Barclay v. Florida,* 463 U.S. 939, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983), the trial judge considered the racial hatred which motivated the crime in deciding to sentence the defendant to death. A majority of the Court rejected the contention that it was improper to do so. *Id.* at 948–49, 103 S.Ct. at 3424 (plurality opinion of Rehnquist, J., joined by Burger, C.J., and White and O'Connor, JJ.) ("The United States Constitution does not prohibit a trial judge from taking into account the elements of racial hatred in this murder."); *id.* at 970, 103 S.Ct. at 3435 (concurring opinion of Stevens, J., joined by Powell, J.) ("the judge's candid exposition of his deeply felt concern about racial crimes had no bearing on any statutory aggravating circumstance, but in and of itself it does not undermine the legitimacy of the ultimate sentence.").

To the extent that the defendants simply complain about being lectured by the judge at sentencing, we are not sympathetic. What the Alabama Supreme Court once said in a different context fits here as well:

> The trial judge is a human being, not an automaton or a robot. He is not required to be a Great Stone Face which shows no reaction to anything that happens in his courtroom. Testimony that is amusing may draw a smile or a laugh, shocking or distasteful evidence may cause a frown or scowl, without reversible error being committed thereby. We have not, and hopefully never will reach the stage in Alabama at which a stone-cold computer is draped in a black robe, set up behind the bench, and plugged in to begin service as Circuit Judge.

*Allen v. State,* 290 Ala. 339, 342–43, 276 So.2d 583, 586 (1973). The Sentencing Guidelines have taken much discretion out of the sentencing process and have made the determination of punishment a more mechanical process, but we are not yet at the punch in and print out stage of judging. There is still room in our system of justice for some expression of humanitarian ideals and for remarks such as those the district court made.

### III. CONCLUSION

The convictions and sentences of the defendants are AFFIRMED.