[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 10-15345

_____

D.C. Docket No. 1:09-cr-20470-JEM-2

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

EMMANUEL MAXIME

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(July 24, 2012)

Before MARCUS and BLACK, Circuit Judges, and HODGES,* District Judge.

HODGES, District Judge:

_____

*Honorable Wm. Terrell Hodges, United States District Judge for the Middle District of Florida, sitting by designation.

Emmanuel Maxime stands convicted and sentenced for a conspiracy and a substantive offense, respectively, in violation of the Hobbs Act, 18 U.S.C. § 1951(a), and a firearms offense in violation of 18 U.S.C. §§ 924(c)(1)(A) and 924(j).  The charges against him arose out of the robbery and murder of Carlos Alvarado while Mr. Alvarado was on duty as a security guard employed by Dunbar Security, Inc., on an armored vehicle transporting cash collected from various retail merchants in Miami-Dade County, Florida.  Maxime received consecutive sentences aggregating to a term of life imprisonment plus forty years. He appeals and asserts five claims of reversible error.  After oral argument and careful review of his claims, we affirm the judgment of the district court in all respects.

## I

On Monday, December 1, 2008, Carlos Alvarado exited his armored vehicle in the parking lot of the Dadeland Mall in Miami-Dade County, Florida shortly after 11:00 a.m.  He then entered the mall carrying a Dunbar Security canvas bag. His purpose was to collect accumulated cash from several of the retail stores in the mall.  He visited the stores and had over $60,000.00 in his bag as he walked toward an exit from the mall in or near a store called The Express.

Earlier, while Alvarado was making his collections in the mall, witnesses observed two men walking around in The Express and in the area of the mall just outside the store. Both were dressed in all black clothing and both were talking on cellular telephones, apparently communicating with each other. These two men were later identified as Dwight Carter and Emmanuel Maxime, the appellant.

As Alvarado approached the exit from the mall, Carter and Maxime, with firearms in their hands, rushed up to Alvarado yelling for him to drop his bag and get on the ground. Alvarado did not immediately comply and Carter fired at least eight or nine shots at him, four of which found their mark. Carter grabbed the Dunbar bag and he and Maxime made a successful getaway. Carlos Alvarado was pronounced dead at a hospital about an hour later.

After the ensuing investigation focused attention on Carter and Maxime as the probable perpetrators of the crime, a criminal complaint was filed in the district court supported by an affidavit reciting that the investigators had assembled several photographic arrays of six persons each using driver's license photos obtained from the Florida Department of Motor Vehicles. The photo spreads containing pictures of Carter and Maxime were shown to four witnesses who had been in the mall and who had observed the perpetrators of the crime. Two of the witnesses identified Maxime as one of the robbers. Another two of the

3

witnesses identified Carter as the shooter.  Additionally, the affidavit recited that cellular telephone records revealed that on the morning of the crime, Maxime was using his cell phone in the area of the mall; that Carter was also in the area of the mall using a cell phone registered in the name of his mother; and that during the twenty minute period before the robbery, Carter and Maxime had spoken to each other on several occasions.  The cellular telephone records also established that Carter and Maxime were using their cell phones in the area of the Dadeland Mall two days before the Alvarado robbery and murder.

In addition to Carter and Maxime, two other persons were also identified as participants in the crimes involving Mr. Alvarado.  They were Erskaneshia Ritchie and Nikkia Thomas.  Ritchie was Carter's girlfriend and Thomas was a close friend of Ritchie.  Both had provided automobiles and acted as lookouts during the Alvarado robbery-murder, and both pled guilty and testified at Maxime's trial.[1]  Their testimony not only implicated Maxime in the robbery-murder of Carlos Alvarado, but also in two earlier robberies of a similar nature.

---

[1]The original indictment was framed in three counts against four defendants: Dwight Carter; Emmanuel Maxime; Erskaneshia Ritchie; and Nikkia Thomas.  The charges were a Hobbs Act conspiracy (Count One); a Hobbs Act substantive offense (Count Two); and the firearm offense (Count Three).  Thomas pled guilty to Count One.  Ritchie pled guilty to a superseding information.  A superseding indictment was then returned against Carter and Maxime only, naming Ritchie and Thomas as unindicted coconspirators.  The district court granted a severance to Carter and Maxime, and both received separate trials.  Both were found guilty.  This appeal involves only Maxime.

After his arrest, Maxime admitted his guilt but then entered a plea of not guilty and moved to suppress his confession.  When that motion was denied, he proceeded to trial.

## II

Maxime's contentions on appeal are:  (1) that his confession should have been suppressed as a violation of his rights under Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966) and Edwards v. Arizona, 451 U.S. 477, 101 S. Ct. 1880 (1981) because the confession was made in response to questioning after he had requested a lawyer; (2) that the prosecution exercised its peremptory challenges to two prospective jurors in a way that violated Batson v. Kentucky,476 U.S. 79, 106 S. Ct. 1712 (1986) and J.E.B. v. Alabama, ex rel. T.B., 511 U.S. 127, 114 S. Ct. 1419 (1994); (3) that the court erred in admitting evidence of prior bad acts in violation of Fed. R. Evid. 404(b)(1); (4) that there was no probable cause for his arrest and the court erred in not granting a Franks[2] hearing; and (5) that his sentence of life imprisonment was substantively unreasonable.

---

[2]Franks v. Delaware, 438 U.S. 154, 98 S. Ct. 2674 (1978).

**III**

A.    <u>The Motion to Suppress</u>.[3]  Maxime was arrested on the morning of May 20, 2009.  He was taken to the Miami-Dade police department and placed in an interview room without restraints.  In taking his biographical information, the investigating officer determined that Maxime was a high school graduate with some college education; that he could read and write the English language; that he was lucid and was not under the influence of alcohol or of any controlled substance or medication; and that he had never suffered from, and had never been diagnosed as having, any psychiatric or emotional dysfunction.

The investigator then explained that before any questioning could proceed it was necessary that Maxime understand his rights.  He next reviewed with Maxime his <u>Miranda</u> rights, and had him read and acknowledge those rights aloud, after which Maxime voluntarily signed a waiver of rights form.  In the discussion that followed the investigator did most of the talking.  It was explained to Maxime that he was under arrest for robbery and murder, after which the investigator reviewed the evidence against him including the fact that several witnesses were

---

[3]In reviewing the denial of a motion to suppress, this Court examines findings of fact for clear error, and the application of law to those facts <u>de</u> <u>novo</u>.  <u>United States v. Goings</u>, 573 F.3d 1141, 1142 (11th Cir. 2009) (quoting <u>United States v. Mercer</u>, 541 F.3d 1070, 1073-74 (11th Cir. 2008)).

6

cooperating and were then being interviewed concerning their knowledge of the crime. One of the witnesses mentioned was Zarita Gaitan, Maxime's girlfriend and the mother of his three year old daughter. At that point Maxime interrupted and asked the investigator to "prove it." The investigator left the room and returned a few minutes later to inform Maxime that Gaitan was still being questioned and was not available to come to Maxime's interview room. Maxime then declared "I want a lawyer." At that point the investigator terminated the conversation and left the interview room telling Maxime to knock on the door if he wanted anything.

A few minutes later, Maxime rapped on the door and asked to be taken to the restroom. On his way back to the interview room after using the restroom Maxime told the investigator that he had changed his mind and would answer questions if he could first talk to his girlfriend, Gaitan. The investigator reminded him that he had invoked his right to counsel and that the interview was over, but Maxime reiterated that he had changed his mind so long as he was permitted to speak to Gaitan before resuming his interview. After making an inquiry, the investigator learned that Gaitan was still being questioned and, during the delay, food was provided to Maxime. It was then determined that Gaitan was willing to talk to Maxime, and she was brought into Maxime's interview room where the two

7

conversed in the presence of the officers.  During their conversation, Gaitan encouraged Maxime not "to make it hard on yourself" because "they know what happened."[4]  Afterward, Maxime expressed his willingness to resume his interview and was again cautioned concerning his Miranda rights.  He then made a full confession which was admitted in evidence at his trial.

Relying upon Montejo v. Louisiana, 556 U.S. 778, 129 S. Ct. 2079 (2009) and Maryland v. Shatzer _____ U.S. _____, 130 S. Ct. 1213 (2010), Maxime argues that any statement made by a person in custody, after he has invoked his right to counsel, is presumed to be involuntary even where the suspect executes a waiver and his statement would otherwise be considered voluntary under traditional standards.  From that correct legal premise Maxime then argues – without any supporting authority – that the presumption of involuntariness in his case was not overcome by the Government because his consent to continue his interview with the investigator after he had previously requested counsel was "conditional at best."  We disagree.

The rule governing this case is the one announced in Edwards v. Arizona. The court made it clear in Edwards that once an accused has invoked the right to

_____

[4]There is no evidence that Gaitan was instructed by the investigators, or coached in any way, concerning what she should say to Maxime during their meeting.

8

counsel during custodial interrogation, a subsequent waiver of that right cannot be established by simply showing that the accused freely responded to additional questions, even if he has once again been cautioned under Miranda before doing so, "unless the accused himself initiates further communication, exchanges, or conversations with the police." 451 U.S. at 485, 101 S. Ct. at 1885. See also Henderson v. Singletary, 968 F.2d 1070, 1075 (11th Cir. 1992) ("This court's precedents clearly hold that where a suspect changes his mind with regard to giving a confession to the police – even after an invocation of the right to counsel – the confession is admissible."). It is true that Maxime established a condition to his willingness to forego his earlier request for a lawyer, but the important point here is that the condition was one he established, not the investigating officers. It was not a bargain they offered; it was one that Maxime alone proposed, and there is no suggestion that Gaitan was acting as a pawn of the investigating officers in conducting the conversation she then had with Maxime. There was no error in denying the motion to suppress. Maxime clearly revoked of his own volition his earlier request for a lawyer, and his subsequent confession was knowingly and voluntarily given in every respect.

B.    The Batson-J.E.B. Issue.[5]  During selection of the jury, Maxime's

counsel raised objections to the exercise of two peremptory challenges by the

United States on the ground that they were prompted by impermissible

consideration of race and/or gender.

It appears that the prosecutor's first three peremptory challenges were

exercised to excuse female African-American jurors.[6]  The fourth challenge was

also directed against a female African-American who stated during her voir dire

examination that she had an aunt who was employed in the Internal Affairs

Division of the Miami Gardens Police Department.  When called upon for an

explanation of the basis of his peremptory challenge, the prosecutor stated:

> I would just point out that she has an internal affairs –
> somebody in internal affairs working in internal affairs, a
> family member and I'm not exactly psyched about the
> kind of stories that she might be hearing with that kind of
> family member so I'd like her off the jury, I would like
> the next jurors frankly better as well so...

---

[5]The district court's credibility finding and ultimate ruling on Batson issues is reviewed
under a clearly erroneous standard, and the trial court's determination is entitled to great
deference.  Snyder v. Louisiana, 552 U.S. 472, 477, 128 S. Ct. 1203, 1207-08 (2008); Rice v.
Collins, 546 U.S. 333, 338, 126 S. Ct. 969, 974 (2006); United States v. Hill, 643 F.3d 807, 837-
38 (11th Cir. 2011).

[6]The record contains defense counsel's undisputed assertion that the subject jurors were
all African-American.  Their gender can only be surmised from their given names; the record is
uncertain on this point.

THE COURT:   All right.  I think that's a race neutral reason.

Later on, during the seating of alternate jurors at the end of the jury selection process, defense counsel raised another Batson challenge to the peremptory excusal by the Government of an African-American female who had previously served on a jury that had not reached a verdict:

> THE COURT:      All right.  Do you want to give me a reason?
>
> [THE PROSECUTOR]:   She was on a jury trial for drugs with no verdict, and I liked juror number 41 better and she's a general manager in South Miami, 20 years married with two kids and I liked 41 better than 40. And that no verdict frankly scared me.
>
> THE COURT;      I think there are plenty of African-Americans on the jury panel, and from my recollection, I think – I believe that's a race neutral reason.

In Batson v. Kentucky, the Supreme Court held that the Equal Protection Clause of the Constitution forbids a prosecutor from striking potential jurors solely on account of their race.  476 U.S. at 86, 106 S. Ct. at 1717.  In J.E.B. v. Alabama, ex rel, T.B., the Supreme Court held that peremptory challenges based on gender are also constitutionally impermissible.  511 U.S. at 143-45, 114 S. Ct. at 1429-30.  In deciding Batson and/or J.E.B. issues, this court has consistently

11

followed the three step approach prescribed by Batson.  First, the district court

(and this Court on appellate review) must determine whether the objecting party

has made a prima facie showing of purposeful discrimination on the basis of race

or gender in the exercise of a peremptory challenge by the other party.  Second, if

a prima facie case is established the party exercising the disputed challenge must

come forward with a race or gender neutral explanation.  Third, the court must

then determine whether the explanation given is a pretextual justification for

purposeful discrimination.  E.g., United States v. Gamory, 635 F.3d 480, 495 (11th

Cir. 2011); United States v. Walker, 490 F.3d 1282, 1291 (11th Cir. 2007); United

States v. Ochoa-Vasquez, 428 F.3d 1015, 1038-39 (11th Cir. 2005).

Normally, in the absence of overt and blatant discrimination, to establish a

prima facie basis for a Batson - J.E.B. objection, it is necessary for the objector to

demonstrate a pattern of conduct from which a discriminatory intent may be

inferred.  It is improper to require an explanation of a peremptory challenge – and

if one has been given it is unnecessary to examine it – in the absence of a prima

facie case.  Central Alabama Fair Housing Center, Inc. v. Lowder Realty Co., Inc.,

236 F.3d 629, 636 (11th Cir. 2000); United States v. Stewart, 65 F.3d 918, 924-25

(11th Cir. 1995).  On the other hand, where the district court has called for and has

ruled upon an explanation of the basis for a disputed peremptory challenge, as

12

here, we have held that any preliminary issue about the prima facie showing has become moot.  United States v. Gamory, supra, 635 F.3d at 495-96; United States v. Edouard, 485 F.3d 1324, 1342-43 (11th Cir. 2007).  See also, Hernandez v. New York, 500 U.S. 352, 358, 111 S. Ct. 1859, 1866 (1991) (plurality opinion).

We will therefore proceed directly to an evaluation of the sufficiency of the prosecutor's explanations for his disputed challenges as given to the district court.  In so doing we are mindful that the explanations provided by the prosecutor need not be persuasive.  United States v. Novaton, 271 F.3d 968, 1002 (11th Cir. 2001).  It is only required that the explanations be credible in the sense that they are not pretextual.  United States v. Edouard, supra, 485 F.3d at 1342.  See also United States v. Walker, supra, 490 F.3d at 1293 ("Under Batson, almost any plausible reason can satisfy the striking party's burden, as long as the reason is race or gender neutral.").

Here, the race and gender neutral reasons given by the prosecutor were at least plausible, if not persuasive, and they were grounded in the record in the form of the jurors' responses on voir dire.  It follows that the district court's acceptance of those explanations was not clearly erroneous, especially since Maxime has not shown that the racial and gender composition of the jury reflected a

13

disproportionate shortfall of African-American women.[7]  See United States v.

Ochoa-Vasquez, supra, 428 F.3d at 1038-43; Cochran v. Herring, 43 F.3d 1404,

1412 (11th Cir. 1995); and United States v. Puentes, 50 F.3d 1567, 1578 (11th Cir.

1995) ("Although the presence of African-American jurors does not dispose of an

allegation of race-based peremptory challenges, it is a significant factor tending to

prove the paucity of the claim.").

    C.    The Fed. R. Evid. 404(b) Issue.  Before Maxime's trial the

Government gave notice pursuant to Fed. R. Evid. 404(b)(2)(A) that it intended to

offer evidence at trial under Fed. R. Evid. 404(b)(2) that Maxime had participated

in two prior robberies at the Westland Mall and the Sawgrass Mall, respectively.

    During trial, over Maxime's objection (but with an accompanying limiting

instruction to the jury), both Ritchie and Thomas testified that Maxime and Carter

had successfully robbed an armored truck guard at the Westland Mall on May 5,

2008, during which a shot was fired at Carter by the guard; and Thomas testified

---

[7]It can be inferred from the record that the jury consisted of seven women and five men, and the prosecution exercised only 5 of its 6 peremptory challenges.  This tends to undermine the claim of gender discrimination.  The number of African-Americans on the jury cannot be determined on this record, but the district judge remarked in passing on Maxime's second Batson challenge that "I think there are plenty of African-Americans on the jury panel . . . ."  It was Maxime's burden to establish a complete record in support of his claims under Batson and J.E.B., and this record deficiency alone could be cited as a fatal flaw in those claims.  See United States v. Gamory, supra, 635 F.3d at 494, n. 16.

14

about Maxime's participating with Carter in another similar robbery some months earlier at the Sawgrass Mall.

Maxime argues that this evidence of the other robberies should have been excluded under Fed. R. Evid. 404(b)(1). The Government responds that the evidence was properly admitted under Fed. R. Evid. 404(b)(2).[8]

This Court has held that a three step test is applied in determining the admission of evidence of other crimes under Fed. R. Evid. 404(b)(2). First, the evidence must be relevant to an issue other than the defendant's character. Second, there must be sufficient proof that the defendant committed the other crime. Third, the evidence must possess probative value that is not substantially

---

[8]Federal Rule of Evidence 404(b)(1) and (2) provides:

**Rule 404. Character Evidence; Crimes or Other Acts**

\* \* \* \*

**(b) Crimes, Wrongs, or Other Acts**.

　　**(1) Prohibited Uses.** Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

　　**(2) Permitted Uses;  Notice in a Criminal Case.** This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. . . .

15

outweighed by undue prejudice. United States v. Jernigan, 341 F.3d 1273, 1280 (11th Cir. 2003) (quoting United States v. Miller, 959 F.2d 1535, 1538 (11th Cir. 1992) (en banc)) (footnote and internal citations omitted).

With respect to the last step in this analysis – which forms the basis of Maxime's argument on appeal – we have held that the district court should engage in a common sense assessment of all of the circumstances of the case including prosecutorial need in relation to the theory of defense, similarity of the other crime to the charged offense, temporal proximity of the two offenses, and whether the other crime has any inflammatory aspects not also present in the charged offense. United States v. Brown, 587 F.3d 1082, 1091 (11th Cir. 2009).

Maxime argues that in his opening statement to the jury he "essentially" conceded his guilt of the conspiracy offense, and that he focused his defense on the substantive crime by asserting that he was not guilty of the robbery or the killing of Carlos Alvarado. From this premise Maxime contends that the evidence of the other robberies had no probative value outweighing its prejudicial effect. The Government responds that Maxime's plea of not guilty placed in issue his knowledge and intent; and, further, that the other robberies in which Maxime had participated were temporally proximate and almost identical in circumstance with no inflammatory features not also present in the commission of the charged

16

offenses. Moreover, the fact that Maxime's theory of defense was to "essentially" concede the conspiracy charge and to argue that Carter – not him – was solely responsible for shooting Alvarado, in no way diminishes the probative value of the earlier robberies. On the contrary, that theory of defense arguably enhances the probative value of the prior robberies in the sense that the circumstances of those crimes, including the shot fired during the Westland Mall robbery, served to put Maxime on notice and supplied him with knowledge of the high probability that a guard would be shot during the Dadeland Mall offense.

We review evidentiary rulings under Fed. R. Evid. 404(b) for an abuse of discretion. United States v. Brown, supra, 587 F.3d at 1091. There was no abuse of discretion in the admission of the Rule 404(b) evidence in this case.

D.     Lack of Probable Cause for Arrest. The affidavit submitted in support of the criminal complaint against Carter and Maxime consisted of two core elements: (1) the eyewitness identifications of the two suspects based upon the photo spreads shown to the witnesses present at the scene of the robbery and murder; and (2) the cell phone records that placed Carter and Maxime in the area of the Dadeland Mall conversing with each other at the time of the crime.

On this appeal, Maxime makes no persuasive argument that the affidavit was insufficient to establish probable cause for the issuance of a warrant for his

17

arrest.  Rather, his principal argument is that he should have received an

evidentiary hearing under Franks v. Delaware, 438 U.S. 154, 98 S. Ct. 2674

(1978), in connection with his motion to suppress.  We find, however, that his

motion fell far short of the mark required by Franks as a precondition to such a

hearing.[9]

In an effort to get a Franks hearing, Maxime's motion in the district court

first asserted:

> [T]he complaint also established that there were
> discrepancies in the witness statements and descriptions,
> as well as known mistakes in identification.  Absent from
> the complaint's critical section attempting to establish
> the identity of the Defendant was information regarding
> the strength of the witnesses identification, how many
> witnesses failed to identify the Defendant, or
> misidentified him, and how the Defendant became a
> suspect.  The result necessarily called into question the
> conclusions of the two witnesses who picked the
> Defendant out of a photo display.

Then, turning to the cell phone records, the motion made the point that there was

no direct evidence supporting the "recklessly false" conclusion stated in the

---

[9]Though presented with the issue on at least three prior occasions, this court has not settled on the appropriate standard of review of a district court's denial of a Franks hearing. United States v. Gamory, supra, 635 F.3d at 490, n 13; United States v. Kapordelis, 569 F.3d 1291, 1308 (11th Cir. 2009); United States v. Arbolaez 450 F.3d 1283, 1293 (11th Cir. 2006). We found in each of those cases that the ruling of the district court passed de novo review – the most exacting standard – so it was unnecessary to decide whether a lesser standard might be more appropriate.  We follow the same course here.

18

affidavits that Maxime was the individual actually using the cell phone (registered

in his name) on the day of the robbery.

In Franks the court held:

> There is, of course a presumption of validity with respect
> to the affidavit supporting the search warrant. To
> mandate an evidentiary hearing, the challenger's attack
> must be more than conclusory and must be supported by
> more than a mere desire to cross-examine. There must
> be allegations of deliberate falsehood or of reckless
> disregard for the truth, and those allegations must be
> accompanied by an offer of proof. They should point out
> specifically the portion of the warrant affidavit that is
> claimed to be false; and they should be accompanied by
> a statement of supporting reasons. Affidavits or sworn
> or otherwise reliable statements of witnesses should be
> furnished, or their absence satisfactorily explained.
> Allegations of negligence or innocent mistake are
> insufficient.

438 U.S. at 171, 98 S. Ct. 2684. See also United States v. Arbolaez, 450 F.3d

1283, 1293 (11th Cir. 2006).

The unsupported statements made in Maxime's motion to suppress were

wholly insufficient to meet the stringent requirements of Franks, and there was no

error in denying a hearing to contest the probable cause affidavit.[10]

---

[10]Maxime argues for the first time on this appeal that the affidavit was also deficient because it did not explain what legal process was followed by law enforcement in obtaining the cell phone records in the first place. This does not suggest that the affidavit was false or reckless in any way, and it does not bolster the application under Franks. Furthermore, "we have repeatedly held that 'an issue not raised in the district court and raised for the first time in an appeal will not be considered in this court.'" Walker v. Jones, 10 F.3d 1569, 1572 (11th Cir. 1994), (quoting Depree v. Thomas, 946 F.2d 784, 793 (11th Cir. 1991)).

19

E.    Reasonableness of Sentence.  We review the reasonableness of a sentence under a deferential abuse of discretion standard.  Gall v. United States, 552 U.S. 38, 41, 128 S. Ct. 586, 591 (2007).  Applying that standard we will affirm the sentence "unless we find that the district court has made a clear error of judgment."  United States v. Frazier, 387 F.3d 1244, 1259 (11th Cir. 2004) (en banc).

Conducting review of a sentence is a two step process.  We first examine whether the sentence was procedurally reasonable – that the district court properly calculated the Sentencing Guidelines range, considered the factors enumerated in 18 U.S.C. § 3553(a), made no clearly erroneous findings of fact impacting the sentencing decision, and adequately explained the chosen sentence.  Gall, 552 U.S. at 51, 128 S.Ct. at 597.  We then consider the substantive reasonableness of the sentence.  The district court is required by § 3553(a) to impose a sentence that is sufficient, but not greater than necessary, to meet the objectives of subsection (a)(2) of the statute.  We determine substantive reasonableness, therefore, by examining the record as a whole in light of the § 3553(a)(2) factors, recognizing that, ordinarily, a sentence within the applicable Sentencing Guidelines range will be deemed to be a reasonable sentence.  United States v. Gonzalez, 550 F.3d 1319, 1324 (11th Cir. 2008).

20

Maxime does not challenge the procedural reasonableness of his sentence. There was no objection to the presentence report or to the district court's determination under the Sentencing Guidelines that Maxime was subject to the advisory term of commitment prescribed for Offense Level 43, Criminal History Category III, the highest level on the sentencing table specifying a term of life imprisonment. Despite the fact that his life sentence was the properly calculated Sentencing Guidelines sentence, Maxime argues that it was substantively unreasonable because he received the same maximum punishment imposed upon Carter, the shooter, even though he, Maxime, was less culpable.

The argument is unpersuasive. It fails to recognize that the crimes of conviction were among the most serious – if not the most serious – that one could commit. It follows, as demonstrated by the Guidelines Sentencing table extending no higher than Offense Level 43 at which life imprisonment is the advisory sentence, that the same maximum punishment for two or more co-offenders will be appropriate in some cases at that level of magnitude where multiple actors of varying culpability are involved in the commission of the same offense. This is such a case, and there was no abuse of discretion on the part of the district court in imposing Maxime's sentence of life imprisonment.

The judgment and sentences of the district court are in all respects AFFIRMED.

21