UNITED STATES of America

v.

**Aaron WYNN, Defendant.**

**No. Crim. 97–111 RCL.**

United States District Court,
District of Columbia.

Nov. 3, 1997.

---

Diana Harris Epps, Asst. U.S. Atty., Eumi Choi, Asst. U.S. Atty., U.S. Attorney's Office, Washington, DC, for Plaintiff.

Santha Sonenberg, Tony W. Miles, Federal Public Defender's Office, Washington, DC, for Defendant.

### MEMORANDUM OPINION AND ORDER

LAMBERTH, District Judge.

This matter comes before the court on defendant Aaron Wynn's Motion to Reinstate Selected Jury filed October 9, 1997. On September 3, 1997, the court conducted the voir dire of 45 prospective jurors and declared a mistrial after the court concluded that defense counsel exercised his peremptory strikes in a discriminatory manner. Presently, defendant's motion challenges this court's conclusion and seeks to have the originally selected jury reseated. Upon examination of the written submissions of the parties and the relevant law, defendant's motion is denied.

### I. Background

Defendant Aaron Wynn, an African American male, is charged in a two count indictment with Unlawful Possession of a Firearm by a Convicted Felon (Count I) and Unlawful Possession of Ammunition by a Convicted Felon (Count II). On January 31, 1997, two white members of the Seventh District Metropolitan Police Department of the District of Columbia placed Wynn under arrest after observing him place a .32 caliber hand gun into the trunk of a vehicle.

On September 3, 1997, the court conducted the voir dire of 45 prospective jurors for the defendant's trial. The court excused six jurors for cause during the initial voir dire questioning. After excusing these jurors, the court turned its attention to the exercise of peremptory challenges. Because the defense possessed ten peremptory challenges

and the government possessed six challenges and there were to be twelve venire members seated as jurors, the first twenty-eight persons on the remaining list became the jury pool. Defense counsel then proceeded to strike every white venire member available to be seated on the jury—a number totaling eight of the nine white venire members. Following the exercise of peremptory strikes, the court seated the first twelve remaining jurors, leaving each side with one final peremptory strike for alternate jurors. Before either side could exercise its final peremptory challenge, the parties approached the bench and the government raised an objection to the manner in which defense counsel had exercised his peremptory challenges. The government asserted that defense counsel had used these challenges in a discriminatory manner by striking eight white jurors on the basis of race, in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

After considering the number of white jurors struck by the defendant and the representations made by the government, as well as the arguments presented by the defense, the court concluded that the government had established a prima facie case under *Batson* and required the defense to articulate a nondiscriminatory reason for each strike. The court found the explanations of defense counsel to be incredible and determined that defense counsel had engaged in a racially discriminatory exercise of peremptory strikes. The court then declared a mistrial and excused the jury.

The defendant challenges this court's conclusion that defense counsel exercised the peremptory challenges in a discriminatory manner and seeks to have the originally selected jury reimpaneled.

## II. *Analysis*

As a preliminary manner, this court is unaware of and defendant has not cited to any case law supporting the extraordinary relief of reseating the original jury sought in defendant's Motion to Reinstate Selected Jury. However, even assuming that such relief is available, defendant has not shown that this court's conclusion that defense counsel

exercised the peremptory challenges in a discriminatory manner was erroneous. Thus, defendant's motion must be denied.

### A. *Race and the Exercise of Peremptory Challenges*

As long ago as the late nineteenth century, the Supreme Court began to strike down laws and practices designed to exclude members of a particular race from service as jurors. In *Strauder v. West Virginia*, 100 U.S. 303, 25 L.Ed. 664 (1879), the Court explained that the State denies an African American defendant equal protection of the laws when it puts him on trial before a jury from which members of his race have been purposefully excluded. The Court held that a defendant had the right to be tried by a jury whose members were selected by nondiscriminatory criteria and took the first steps toward abolishing race as a consideration for jury service.

Over thirty years ago, the Supreme Court first addressed the issue of whether the Equal Protection Clause was violated by a prosecutor's racially motivated exercise of peremptory challenges. *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). In *Swain*, the Court recognized that the unfettered use of peremptory challenges bore a heavy burden on society as such challenges were traditionally "exercised on grounds normally thought irrelevant to legal proceedings ... namely, the race, religion, nationality, occupation, or affiliations of people summoned for jury duty." *Id.* at 220, 85 S.Ct. 824. Accordingly, to reduce the costs associated with the unfettered use of these challenges, the Court in *Swain* held that a violation of equal protection could be established by proof that supported a reasonable inference that African Americans "are excluded from juries for reasons wholly unrelated to the outcome of the particular case on trial" and a showing that the peremptory system is being used to deny these individuals "the same right and opportunity to participate in the administration of justice enjoyed by the white population." *Id.* at 224, 85 S.Ct. 824.

Although the Court in *Swain* took marked steps toward eliminating race-based decision-

making in the selection of jurors, defendants relying on the holding in *Swain* faced a formidable burden due to the evidentiary standard articulated in that case. Under *Swain*, to establish a prima facie case of a violation of the Equal Protection Clause of the Constitution by a prosecutor's exercise of peremptory challenges, a defendant was required to show an inference of purposeful discrimination. *Id.* at 223, 85 S.Ct. 824. According to *Swain*, such a showing could only be made by the presentation of evidence establishing that the prosecution engaged in a repeated practice of racially motivated peremptory strikes in numerous cases.

In the landmark case of *Batson v. Kentucky*, the Supreme Court expressly rejected the evidentiary formulation suggested by the *Swain* decision. *Batson*, 476 U.S. at 93, 106 S.Ct. 1712. The Court stated that a criminal defendant was no longer required to prove "repeated striking of blacks over a number of cases" in order to establish a violation of the Equal Protection Clause. *Id.* at 92–93, 106 S.Ct. 1712. Instead, the Court held that equal protection principles forbade a prosecutor from challenging potential jurors on the basis of their race or on the assumption that members of a certain racial group would be unable to be impartial in a given case. *Id.* at 89, 106 S.Ct. 1712. As will be discussed below, the Court then proceeded to set out a three part test for evaluating claims that a prosecutor used peremptory challenges in a discriminatory manner.

In a still more recent decision, *Georgia v. McCollum*, 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992), the Court expanded the scope of *Batson* to reach racially discriminatory peremptory challenges exercised by criminal defendants. In that case, the Court held that the government had standing to object to a defendant's racially discriminatory use of peremptory strikes.

The Court's holding in *McCollum* not only completed the constitutional premise that racial considerations by either the prosecution or the defense have no place in the selection of a jury, but also provided a more thorough explanation of the rationale underlying this premise. When a court permits a party to discriminate against potential jurors on the basis of race, it becomes a vehicle facilitating discrimination by "those who are of the mind to discriminate" through the use of peremptory challenges. *Batson*, 476 U.S. at 96, 106 S.Ct. 1712 (quoting *Avery v. Georgia*, 345 U.S. 559, 562, 73 S.Ct. 891, 97 L.Ed. 1244 (1953)). Quite simply, "racial discrimination in the selection of jurors 'casts doubt on the integrity of the judicial process' . . . and places the fairness of a criminal proceeding in doubt." *Powers v. Ohio*, 499 U.S. 400, 411, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991) (quoting *Rose v. Mitchell*, 443 U.S. 545, 556, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979)). The Supreme Court has explained that the harm from discriminatory jury selection extends beyond that inflicted on the parties involved in a particular case and touches the entire community. *McCollum*, 505 U.S. at 49, 112 S.Ct. 2348 (quoting *Batson*, 476 U.S. at 87, 106 S.Ct. 1712). Indeed, selection procedures that purposefully exclude certain races from juries undermine public confidence in the judicial system. *Id.* "Just as public confidence in criminal justice is undermined by a conviction in a trial where racial discrimination has occurred in jury selection, so is public confidence undermined where a defendant, assisted by racially discriminatory peremptory strikes, obtains an acquittal." *Id.* at 50, 106 S.Ct. 1712.

In light of these considerations, this court is mindful of the fact that the exercise of a peremptory strike is the exercise of a quintessential government power to be invoked under the careful control of the court. Thus, close scrutiny is to be employed at all times during the selection of a jury to ensure that expressions of racial prejudice find no place in the exercise of peremptory challenges. With these considerations in mind, this court may now properly turn its attention to the instant case.

### B. *The Analytical Framework*

When a party alleges a discriminatory use of peremptory strikes—a *Batson* challenge—the court must conduct a three-part inquiry. First, the court must require the opponent of the challenge to make out a prima facie case of racial discrimination. Second, if the requisite showing is made, the

**12**

burden shifts to the proponent of the strike to come forward with a race-neutral explanation for striking the juror in question. The second step of the inquiry does not require that the explanation be persuasive or even plausible. *Purkett v. Elem*, 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995). The proffered reason need not be worthy of credence or related to the issues to be tried or to the prospective juror's ability to provide acceptable jury service. All that is required is that the reason be race-neutral. *Id.* at 767, 115 S.Ct. 1769. Third, if the previous steps are met, the trial court must then decide whether the explanation is pretextual and whether the opponent of the strike has met its burden of proving purposeful discrimination. "[T]he ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." *Purkett*, 514 U.S. at 768, 115 S.Ct. 1769.

■ The *Batson* analysis, therefore, requires a finding of fact as to the discriminatory intent of the striking party. *Hernandez v. New York*, 500 U.S. 352, 364, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991). Indeed, "[i]n the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed." *Id.* As the Supreme Court has noted, "[t]here will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge." *Id.* Such findings of fact made by the trial court turn largely on credibility determinations and should be given great deference and reviewed for clear error, as the evaluation of a party's state of mind based on demeanor and credibility lies "peculiarly within a trial judge's province." *Id.* at 365, 111 S.Ct. 1859 (quoting *Wainwright v. Witt*, 469 U.S. 412, 428, 105 S.Ct. 844, 854, 83 L.Ed.2d 841 (1985)).

In the instant case, the three-part *Batson* inquiry clearly demonstrates that the defendant employed his peremptory strikes in a racially discriminatory manner.

1. *The Government's Prima Facie Case*

■ As part of the prima facie showing of a *Batson* violation, the government must demonstrate that the defendant exercised peremptory challenges to remove members of a particular racial group from the venire panel and that all the relevant circumstances raise an inference that the defendant exercised the challenges on account of race. Relevant circumstances may include a pattern of strikes against members of a particular racial group, as well as an attorney's statements and the types of questions submitted in the voir dire examination. As the Supreme Court in *Batson* explained:

> [T]he trial court should consider all relevant circumstances. For example, a "pattern" of strikes against black jurors included in the particular venire might give rise to an inference of discrimination. Similarly, the [party's] questions and statements during *voir dire* examination and in exercising his challenges may support or refute an inference of discriminatory purpose. These examples are merely illustrative. We have confidence that trial judges, experienced in supervising *voir dire*, will be able to decide if the circumstances concerning the [party's] use of peremptory challenges creates a prima facie case of discrimination against black jurors.

*Batson*, 476 U.S. at 96–97, 106 S.Ct. 1712.

In the instant case, the defendant, an African American, struck every possible white juror that could have been seated on the jury panel. Indeed, eight of the ten peremptory challenges used by defense counsel were exercised to strike whites from the jury panel even though whites comprised only a minority of the venire. R. 109. Such a pattern of strikes against members of a particular racial group is sufficient to establish a prima facie case under *Batson*. *See, e.g., United States v. Stewart*, 65 F.3d 918, 925 (11th Cir.1995) (finding a prima facie case and stating "[a]lthough no particular number of strikes against blacks automatically indicates the existence of a prima facie case, here the defendants struck seventy-five percent of the black venire members, which amounted to all but one of them"); *United States v. Sowa*, 34 F.3d 447, 452 (7th Cir.1994) ("The govern-

ment easily made its *prima facie* case that the peremptory challenges were motivated by race; each and every black venireperson was challenged."). *See also Powers*, 499 U.S. at 416, 111 S.Ct. 1364 ("Racial identity between the defendant and the excused person . . . may provide one of the easier cases to establish both a prima facie case and a conclusive showing that wrongful discrimination has occurred.").

### 2. *Defendant's Facially Neutral Explanations*

■ Once a prima facie showing has been made that a party exercised its peremptory challenges in a discriminatory manner, a burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation for striking the juror in question. Indeed, the second step of the *Batson* process does not demand an explanation that is persuasive, or even plausible. "[T]he issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Hernandez*, 500 U.S. at 360, 111 S.Ct. 1859. In the instant case, the defendant met this burden.

Defense counsel proffered a race-neutral explanation for each peremptory strike made, as he rested the exercise of his peremptory strikes on either the age, occupation, relationship or connection to law enforcement personnel, or residence of each venire person struck. A party's explanation for a strike is deemed race-neutral if discriminatory intent is not inherent in the stated reasons. *Purkett*, 514 U.S. at 769, 115 S.Ct. 1769. Thus, the explanations offered by the defendant for the strikes were sufficient to carry the burden of production under *Batson*, as it would have been improper for the court to probe into the plausibility of these explanations at this stage of the proceedings. *Purkett*, 514 U.S. at 768, 115 S.Ct. 1769 ("[To require the explanation to be both race-neutral and plausible] violates the principle that the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.").

### 3. *Determining Pretext*

■ Once defense counsel has proffered a race-neutral explanation for each peremptory challenge at issue, the court is then instructed by *Batson* to determine whether the explanations supporting each peremptory strike are a pretext for the discriminatory exclusion of members of a particular racial group. Ultimately, "the trial judge determines, in light of all the facts and circumstances whether the [*Batson* challenger] has established the existence of purposeful discrimination." *United States v. Jiminez*, 983 F.2d 1020, 1023 (11th Cir.1993). In this case, the record clearly demonstrates that the defense counsel exercised his peremptory challenges in a manner designed to exclude white venire members from the jury.

#### a. *Inconsistent Application of Selection Criteria*

■ When a party bases its peremptory challenges on certain characteristics such as age or employment status, pretext can be demonstrated by evidence that stricken panel members of one racial group are similarly situated or share the characteristics of a non-stricken panel member of a separate racial group. *United States v. Jenkins*, 52 F.3d 743, 747 (8th Cir.1995); *Davidson v. Harris*, 30 F.3d 963, 965 (8th Cir.1994) (noting otherwise neutral explanation for removal of black juror may be pretextual if stated reason also applies to white juror who is not removed); *United States v. Alvarado*, 951 F.2d 22, 25 (2d Cir.1991) ("The force of a prosecutor's explanation for challenging a minority member of a venire is obviously weakened substantially by evidence that non-minority members to whom the same explanation applies were not challenged.").

In the present case, defense counsel offered the explanations of age, employment, relationships with individuals in law enforcement, and residence as reasons for striking white venire members. An examination of the record reveals that these criteria were applied inconsistently to members of different races and demonstrates that the defense counsel's proffered reasons were a pretext for discriminatory elimination of white venire members from the jury.

Defense counsel offered age as one of the explanations for striking Jurors 270, 614, and 642, ages 67, 60 and 56 respectively. Although age may be a valid basis for exercising a peremptory challenge, a review of those jurors passed over by the defense reveals that three African American jurors who were seated—Jurors 198, 124, and 896, ages 71, 69, and 68 respectively—were all over the age of the three who were struck allegedly because of their age.

Defense counsel also struck Jurors 270, 614, and 139 because of their connections and relationships with individuals working in law enforcement. Again, this court notes that such an explanation may provide a legitimate explanation for the exercise of a peremptory challenge. However, a review of the record indicates that this criterion was inconsistently applied to members of different racial groups. Juror 663, a black male, worked as a reserve officer with the Third District Metropolitan Police Department. Juror 198, a black male, had a nephew who was a police officer and his daughter worked for the Federal Bureau of Investigation. Juror 672, a black female, had a brother who worked for the Metropolitan Police Department. Juror 162 had an uncle who was a retired member of the Metropolitan Police Department and neighbors employed by the United States Park Police and the United States Marshals Service. Finally, Juror 235, a black female, had a cousin who was a retired Metropolitan Police Officer. Despite their obvious connection to individuals employed in some capacity of law enforcement, defense counsel inexplicably failed to strike any of these members of the venire.

Defense counsel also relied on the nature of certain jurors' employment as a basis for exercising peremptory challenges. In referring to certain employment positions as "a kind of a white collar type position ...," defense counsel struck four white jurors on the basis of their employment. Juror 614 was struck because she was employed as an administrative aide at the Library of Congress, and Jurors 642, 430, and 154 were each struck because of their employment as business managers in the upper Northwest area of Washington, D.C. Review of those

jurors passed over by the defense and seated in the jury box reveals that Juror 313, a black female, was also employed as a business manager and Juror 235 was employed as a personnel officer for the Council of the District of Columbia.

Some circuits have observed that an explanation for a peremptory challenge, though weakened, is not automatically to be rejected because it applies to members of other racial groups who were not challenged. *See, e.g., United States v. Lance,* 853 F.2d 1177, 1181 (5th Cir.1988); *United States v. McCoy,* 848 F.2d 743, 745 (6th Cir.1988); *United States v. Lewis,* 837 F.2d 415, 417 n. 5 (9th Cir.1988). In the instant case, however, such a gross pattern of inconsistent application of stated criteria leads this court to the only plausible conclusion—defense counsel exercised his peremptory challenges in a manner designed to exclude all white venire members from ultimately serving on the jury in this case.

b. *Disparate Impact of Defense Counsel's Selection Criteria*

■ Six of the eight white venire members struck by defense counsel either lived or were employed in the upper Northwest area of Washington, D.C. As defense counsel explained:

I think that's one of the factors among many, but I think that people that come from that area may not—regardless of race—haven't had as much contact with police officers, or at least I think their contacts with a police officer I think are different than people who live in Northeast or Southeast Washington. In my opinion or my experiences have not had encounters or many encounters where police officers are untruthful or where they harass them and things of that nature.

R. at 111.

■ It is clear that in this case, reliance on residence or employment in a certain location of Washington, D.C. as a criterion for striking potential jury members had a disparate impact on white members of the venire. When a party relies on criteria such as residence that ultimately results in the exclusion of a certain group from jury service, it is necessary to determine whether

such criteria is, in fact, a proxy for race. As one court has stated:

> If [a party's] explanation, generally applied, would have a disparate impact on a particular racial group, this fact should cause a trial judge to exercise special scrutiny during the third step of the *Batson* process to determine whether intentional discrimination, as a matter of fact, underlies [the party's] peremptory challenge.

*United States v. Uwaezhoke*, 995 F.2d 388, 393 (3d Cir.1993).

 Although residence may appear to be a facially neutral explanation for the exercise of a peremptory challenge, "where residence is utilized as a surrogate for racial stereotypes ... its invocation runs afoul of the guarantees of equal protection." *United States v. Bishop*, 959 F.2d 820, 826 (9th Cir.1992). A party may be permitted to rely on residence to justify the use of a peremptory challenge "[w]here residence is utilized as a link connecting a specific juror to the facts of the case." *Id.See also United States v. Briscoe*, 896 F.2d 1476, 1488 (7th Cir.1990) ("[T]he government's explanation for its strike went well beyond a cursory statement that [the juror] resided [in a given area]."). However, as in this case, where residence of jurors has no cognizable connection to the facts of a particular case, it can only be stated that residence is nothing more than a proxy for race. Defense counsel failed to make any showing otherwise at trial.

 Thus, defendant has failed to establish that this court erred in its conclusion that defense counsel exercised its peremptory challenges in a discriminatory manner in violation of the Equal Protection Clause of the Constitution. Even though defense attorneys are charged with providing adequate representation for their clients, this representation must fall within the parameters of the Constitution. As the Supreme Court has stated, "neither the Sixth Amendment right nor the attorney-client privilege gives a criminal defendant the right to carry out through counsel an unlawful course of conduct." *McCollum*, 505 U.S. at 58, 112 S.Ct. 2348.

 Race-based peremptory challenges have no place in the courtroom—whether made by prosecution or defense; whether made against black or white venire members. Once largely beyond the control of the trial court, the peremptory challenge now must be closely scrutinized to ensure that even the most subtle forms of racism are eliminated from the today's jury system. Not only does the Constitution demand such a result, the integrity of the judicial system and the public confidence in this system depend upon such a result.

### III. *Conclusion*

For these reasons, defendant's Motion to Reinstate Selected Jury is DENIED.

Appended hereto is the transcript of the bench conference discussion of the *Batson* challenge.

Attachment 1

198, Juror Number 10.

663, Juror Number 11.

219, Juror Number 12.

THE COURT: All right. If you'll wait just a moment, ladies and gentlemen. They get one additional peremptory each before we seat the two alternates.

(Pause.)

MS. EPPS: May the parties approach, Your Honor?

THE COURT: Yes.

**(Discussion at the bench on the record.)**

MS. EPPS: I would just like to know for the record, it appears as though 7 out of the 10 strikes were people of the Caucasian race. And I was just questioning that, and I'm placing that on the record at this time. Taking into consideration my strikes and those individuals remaining in the audience, and I would just call that to the Court's attention. I find that extremely troublesome, given the nature of this particular offense, the nature of the District of Columbia, and responses given by these persons, some of which did not even approach the bench to give any cause or any reason. I would just draw that in cause questioning, and find that extremely disturbing on behalf of the United States Government.

THE COURT: Are you asking me to take some action?

MS. EPPS: I would ask for an inquiry at this time. I find that 7 out of 10 strikes are for individuals that—many of which did not even come up to the bench.

THE COURT: Okay.

MR. MILES: At this time you want me to—what does the Court want me to do?

THE COURT: Well, you can respond to her argument.

MR. MILES: My argument, it's 7 out of 10. I struck some blacks are on the panel as well as passed over some whites and allowed them. I don't know—we didn't seem to get as far down the list as we could have. But I understood that fair game here, and there are many more potential jurors, and I passed over a few whites and struck blacks.

THE COURT: Well, a panel of 12 blacks is seated. Her argument is that of the 10 peremptories that you used, you struck 7 whites and 3 blacks, and that no white has been seated. So that would appear on its face to give a prima facie case of discrimination in the striking of all whites. And I guess that appears to be her argument.

And I guess then that if you can't contest that it was a prima facie case, then we are going to have to articulate a reason for each strike of a white.

MR. MILES: Your Honor, first, I don't think a prima facie case has been made for the reason just stated, because it is 7 out of 10. That's not 10 of 10 or even 9 or 8 out of 10. I think typically these cases, it's usually the strikes are maybe all but one or two. I think that's when a case for discrimination may be a concern of Court, but 7 out of 10 is not. I don't think it rides into the level of making a prima facie case against discrimination. And, again, as I noted, I did strike blacks, and I passed over whites and did not strike them. And had the government exercised more peremptory challenges, there would have been whites on this jury, because I—

THE COURT: You didn't pass over any whites. There's no whites seated. What white did you pass over?

MR. MILES: Let me see if I can—I believe—

MS. EPPS: Because if there was, that person would be seated.

THE COURT: Right.

MR. MILES: Did you use all your six strikes, all six strikes?

MS. EPPS: Yes.

MR. MILES: I will tell you this. I must have had a different understanding of what the field was, because I thought the field—I even made notation on my notes that I thought all the way down to 736 could have been fair game.

481, I don't know what race 481 is. I'm trying to look and see. I'm not sure of the race. I'm looking at people who I passed over.

MS. EPPS: Your Honor, may I just have a brief moment to get my notes, because he's going to have to give an explanation.

THE COURT: Yes.

MS. EPPS: Thank you for the time, Your Honor.

THE COURT: Well, it would appear to me that there is a prima facie case, and let me put on the record, so I can confirm with the clerk.

632 appears facially to be a black male, and he was struck by—

THE DEPUTY CLERK: Government, Your Honor.

THE COURT: The government. 270 appears to be a white female, and she was struck by—

THE DEPUTY CLERK: The defense.

THE COURT: 614 appears to be a white female, and she was struck by?

THE DEPUTY CLERK: Defense.

THE COURT: 499 appears to be a white female.

THE DEPUTY CLERK: Defense.

THE COURT: And she was struck by defense. 99 is a black male.

THE DEPUTY CLERK: Defense.

THE COURT: Struck by defense. 139 appears to be a white male.

THE DEPUTY CLERK: Defense.

THE COURT: 249?

THE DEPUTY CLERK: The government.

MR. MILES: For the record, the race is?

THE COURT: Appeared to be a black male. 267?

THE DEPUTY CLERK: Government.

MR. MILES: Can the race be noted for the record?

**(End of discussion at the bench.)**

THE COURT: Would 267 stand up, please?

**(Discussion at the bench on the record.)**

THE COURT: I can't see her. Oh, there she is. black female.

362?

THE DEPUTY CLERK: Government.

**(End of discussion at the bench.)**

THE COURT: Could 362 stand?

**(Discussion at the bench on the record.)**

THE COURT: Okay, black female. 769?

THE DEPUTY CLERK: Defense.

THE COURT: Is a white female. 642?

THE DEPUTY CLERK: Defense.

**(End of discussion at the bench.)**

THE COURT: 642, could you stand?

**(Discussion at the bench on the record.)**

THE COURT: A white male. 813?

THE DEPUTY CLERK: Defense.

THE COURT: Is a white male. So to that point there were eight strikes by the defendant.

THE DEPUTY CLERK: Juror 430 was struck by the defendant.

THE COURT: 430, okay. And what's the other one?

THE DEPUTY CLERK: Juror 207 was struck by the government.

THE COURT: And who else did the defendant strike?

THE DEPUTY CLERK: Juror 154.

MR. MILES: What was 207's race?

MS. EPPS: He's a white male, the real estate guy.

MR. MILES: Excuse me?

MS. EPPS: The real estate man.

MR. MILES: Well, I would think that he's a Latino or something.

THE COURT: He appears facially to be a white male. 154 is a white female.

**(End of discussion at the bench.)**

THE COURT: Could 430 stand?

**(Discussion at the bench on the record.)**

THE COURT: Okay. It's a black female.

MR. MILES: After 207 where did you go?

THE DEPUTY CLERK: 154, Patricia Clark.

MR. MILES: And that was a defense?

THE DEPUTY CLERK: Defense.

MS. EPPS: Who's 154, a black female?

THE COURT: White female.

THE DEPUTY CLERK: And the government had one more strike, 88, William Bradley.

MR. MILES: And his race?

MS. EPPS: Black male.

THE COURT: So actually, 8 of the 10 strikes by the defendant were white. Is that right?

MS. EPPS: Yes, Your Honor.

THE COURT: Okay. So I find that is a prima facie case, and I require the defendant to articulate a reason for each strike.

MR. MILES: Do you want me to articulate a reason for each strike of white individuals or for every person?

THE COURT: Yes. You can start with the whites.

MR. MILES: 270 start with?

THE COURT: Yes.

MR. MILES: 270 because she was an older retired person who lived in what I thought to be upper Northwest D.C. She had a cousin-in-law who was a district attorney in D.C. She said D.A., but since we're in D.C. I assume that means U.S. Attorney's Office.

Juror 614—

MS. EPPS: The Court's brief indulgence.

THE COURT: All right.

MR. MILES: Okay. 614 was, the age was relevant, that she worked at the Library of Congress as an administrative assistant, a kind of white collar type position in my mind. I may be incorrect on that. That's where I'm thinking. She has a daughter who was a district attorney in Dallas, and a daughter in Arlington who somehow works in the prison.

I'll just go in the order, I guess, of who I struck, if you like, because I'm not sure who's who as far as race is concerned.

Juror 499, the legal secretary at Ernst & Young. I guess—I have two different—I have Ernst & Young from that, from the juror sheet, but I have on my notes she made representation she's a legal secretary for General Counsel's Office.

THE COURT: I have Big 6 accounting firm, I thought she said.

MR. MILES: Okay. I had general counsel. I may have been wrong, but I have Ernst & Young on my notes over here for the sheet. And that was my reason. And living upper northwest. At least—I'm not very familiar with D.C., but I understand it to be upper Northwest.

Juror 99, his son was a police officer with the 7th District. He has a friend who was a warden in South Carolina. The main thing was the son being in the 7th District.

Juror 139, this person has a cousin who was a DEA agent, and these officers here during the suppression hearing made comments about drugs or they know my client through suspicion of being involved in drugs. Another relative of his is with U.S. Customs. This person has a neighbor with the MPD. So I thought there was a lot of law enforce-ment connections, and this person, on top of it, had thefts in his home, and he lives in upper Northwest, or at least what I believe to be upper Northwest.

THE COURT: What's wrong with living in upper Northwest?

MR. MILES: I think that that's one of the factors, among many, but I think that people that come from that area may not—regardless of race—haven't had as much contact with police officers, or at least I think their contacts with a police officer I think are different than people who live in Northeast or Southeast Washington. In my opinion or my experiences have not had encounters or many encounters where police officers are untruthful or where they harass them and things of that nature.

Which one did I discuss last?

THE COURT: 139.

MR. MILES: I guess I'm on 769, I believe is the next one. This is a person who has a brother who has been shot. His partner was shot, and she said she didn't like guns. Seemed clear, and seemed to be very kind of turned off to guns.

Let's see, 642. I have in my notes that the employment at Trade Association seemed to me in the upper Northwest, and the age seemed to me to indicate a person who may not be as much in touch with—

MS. EPPS: Which number is that?

THE COURT: 642.

MR. MILES: 642. 813, my client—and I guess I'll reveal this—this is could be—this is a comment from my client, but I don't think—he said that this person, he didn't like the way he looked at him.

THE COURT: Yes, because he's white.

MR. MILES: No, I don't think so, Your Honor. He said he's been staring at him. This is the only person my client said this about and there are many whites. And I looked over there and he—and I'll make the representation that when we were looking at the panel, I saw him staring at us often.

430, this person is a business manager. She lives in what I understand to be upper Northwest. The main thing would be the

experiences she's had with violence, her friend's husband shot. I think she had a relative who was killed. And in addition, she's had thefts in her home, so she's had experience being the victim of a crime.

154, I believe, is the last person. This person's brother has some type of association—as I understand, high up in the chain at the Bureau of Prisons. And, again, he's a business manager, and he lives in what I understand to be upper Northwest. But the Bureau of Prisons was particularly troublesome I think.

THE COURT: All right. Want to address those?

MS. EPPS: Juror Number 303, she carries a Capitol Hill address, and Capitol Hill traditionally is—upper Northwest, so with regard to his argument about all those individuals living in upper Northwest, I haven't had an opportunity to check each one of the other individuals' addresses, and I find that to be extremely specious.

I would note with regard to the other individuals and age, you asked a specific question about hearing, health and otherwise, and none of them raised their hands. I then took it a step farther and asked Juror Number 99 to come forward because I had a personal concern. At actually no time did defense counsel ever ask the Court to bring forward any of the elderly persons to question them about any possible hearing or inability to pay attention. Again, that was an extremely specious—I would not that that particular juror, when asked a question, didn't ask for it to be repeated, was competent to listen and answer directly, held onto the microphone and then passed—I'm specifically referring to that Juror 207, who lines in a middle class neighborhood. Evidently the defendant has a problem with individuals who live in a middle class neighborhood.

THE COURT: 270.

MS. EPPS: 270.

As well, what is also specious, the fact that this person has a white collar type job, for example, the Library of Congress person, there was no question asked of that individual, and I would note that the individual who allegedly looked at defendant speciously is a physician, and absolutely not one question was asked of him, other than the fact that he, evidently, is a neighbor with one of the other petit jurors.

I find all the implications with regard to geographic area, the implications of their income, the implications of alleged inability to pay attention, to their age, without any inquiry to be extremely specious, and call the Court to take the appropriate action in this instance.

THE COURT: What action would be appropriate?

MS. EPPS: I believe that we have to begin again, because I believe that this particular panel has been tainted extremely, and we would have to start again. I apologize. I did not anticipate this, and I apologize for any inconvenience this may cause the Court, but I do not believe that the explanations given by defense counsel have established his—the burden that was placed upon him.

MR. MILES: Your Honor, I'd like to note for the record I was not—my strikes did not involve race. I did not even question the government's strikes as involving race. That's why I was up here. I was asking the race of their strikes, because now that they raised the concern, I wonder what could have been in the government's mind, and I want to note for the record that of the government's six strikes, it appears to me that all but one are black, and the one who's not a black, I feel, in my opinion, although the Court is going to recognize the person as white, I think the person's a Latino person. The last name is Diaz, and the person has dark black hair—

THE COURT REPORTER: Excuse me one moment while I change my tape. (Brief pause.)

THE COURT REPORTER: Mr. Miles, you continued to talk while I was changing my tape. You will have to start over.

MR. MILES: The comment of the Latino was that I was saying that I had considered him a person of color. It looks to me as if the government has used all its strikes on people of color, had not stricken a white

person. I did not think on raising a Batson challenge because I was not—I was not making my selection based on race. I didn't think she was, but I noted, for the record, because if the government is going to tell the Court that it didn't make its challenges based on race, I find their statistics quite interesting as well. I am willing to—because I know what my intentions were, I'm willing to believe that their reasons for striking these people were race neutral, and I'm willing to believe that the six out of six strikes being people of color was not based on race, and I think that the statistics in their case don't necessarily reflect any racial intention, and they certainly don't in my case. But I think that point is important. It's not as if their— the racial make-up of their strikes is evenly spread.

THE COURT: Do you want to respond to that?

MS. EPPS: Actually, Your Honor, I can respond. He hasn't made out a prima facie case.

THE COURT: Right.

MR. MILES: Just to make it clear, I'm not asking for a *Batson* thing. I'm just—

THE COURT: I understand. I was just asking if she wanted to respond to what you said. I'm not asking her to give an explanation.

MR. MILES: I understand.

MS. EPPS: I just wanted to note that I haven't been able to go through all the jurors, but Juror 672 had a Southeast address; Juror 162 carries a Northeast address; Juror 896 carries a Southeast, Capitol Hill address, which again is equivalent to Northwest; Juror 313 carries a Northeast; Juror 235, Southeast; Juror 884, Northwest. Again, this is Southeast, Sixth District—this is Southeast, Seventh District. I wasn't able to go through them all. So, I mean, the argument that, again, for whatever reason, it's the geographic, and then even going through what persons do for a living, I would note that Juror 884, who happens to live in Northwest, works for Public Works? Now, what is that, a white collar or blue collar job? That

is an employable job. I would note that Juror 235, who lives in Southeast, is a personnel officer for the D.C. Council. That's an extremely white collar job. But, again, that's the reason why a combination of those factors were employ. I could go through, but I didn't have an opportunity to go through them.

MR. MILES: Your Honor, just to make just a couple points. Number one, I don't equate Capitol Hill as being equivalent to Northwest, upper Northwest. If there is a Southeast, Capitol Hill address, again, I've only lived in the District for about a year and a-half, and if it's a Capitol Hill address, I didn't actually know that. I saw "Southeast."

Secondly, I didn't say neighborhood was a controlling—actually, I think in most—I think in almost every case the Northwest section was just another factor on top of things, such as, significant ties to law enforcement, being victims of crimes or having family members being victims of serious crimes, serious aversion to guns.

MS. EPPS: I'm sorry, may I just interject briefly here?

MR. MILES: Yes.

MS. EPPS: Actually, Juror Number 884 lives in Clifton Terrace, N.W., and I don't know if defense counsel is familiar with the amount of horrendous offenses that happen in that area. But that's specious that that individual lives in Northwest, he's saying everybody in Northwest should not be on, but curious enough the one person on the panel that lives in Northwest lives in one of the most violent areas in Northwest.

MR. MILES: Well, Your Honor, I didn't—

THE COURT: In any event, I've heard enough. Based on the prima facie case and the explanation offered by the defendant, which I find to be incredible in several circumstances, I declare a mistrial. I grant the *Batson* challenge. I believe that the defendant has engaged in a racially discriminatory exercise of pre-emptories that the Court cannot condone, and, therefore, the jury will be excused. A new jury will have to be sum-

moned, and, therefore, we'll have to set a new date for a new trial.

MS. EPPS: Yes, Your Honor. May I step back?

THE COURT: Yes.

MS. EPPS: Thank you, Your Honor.

**(End of discussion at the bench.)**

THE COURT: Ladies and gentlemen, in light of the manner in which the pre-emptory challenges have been exercised, in my view improperly, a mistrial is hereby declared. You are excused from further service. All of you are excused from further service. We're going to start this one all over again. On behalf of the Court and the community, you did your job. I thank you for your service as jurors in this case. You are all excused.