[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

————————————

No. 12-10046

————————————

D. C. Docket No. 8:08-cr-00240-EAK-TBM-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JAMES ROBERTSON,

Defendant-Appellant.

————————————

Appeal from the United States District Court
for the Middle District of Florida

————————————

(November 12, 2013)

Before JORDAN, COX and DUBINA, Circuit Judges.

DUBINA, Circuit Judge:

Appellant James Robertson ("Robertson") appeals his convictions for two

counts of murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1).

Robertson challenges the district court's denial of his pretrial motion to dismiss the indictment, its ruling sustaining the government's first *Batson*[1] challenge, and its denial of his motion for acquittal. After reviewing the record, reading the parties' briefs, and having the benefit of oral argument, we affirm Robertson's convictions.

I.

On Sunday, September 13, 1998, police found the bodies of two homeless men, Alfred Williams and Richard Arseneau, at different locations in Tampa, Florida. Both had been beaten severely and had died from trauma to the skull. The previous night, Robertson and three other members of a local white supremacist group, Tampa Blood and Honour, sought these victims, beat them severely, and left them for dead. The police lacked any evidence of the murderers' identities or motives, and the two cases went cold.

A. *The government's alleged immunity offer preceding Robertson's indictment*

In 2002, while under indictment in the Middle District of Florida for bank robbery with co-defendant William Schroeder ("Schroeder"), Robertson entered a plea agreement with the government that secured his cooperation. The agreement provided that any information Robertson offered would not be used against him to enhance his bank robbery sentence. The agreement did not promise that

---

[1] *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712 (1986).

Robertson's statements would not be used against him for the prosecution of other crimes. Robertson's attorney at the time contacted the government to say that Robertson wished to cooperate against Schroeder. The assistant U.S. Attorney on the case, Anthony Porcelli ("Porcelli"),[2] agreed to ask the district court to depart downward in sentencing Robertson pursuant to USSG § 5K1.1. Robertson then filed a motion asking for a downward departure under USSG § 5K2.0, claiming that he participated in the robbery under duress. Doubting Robertson's claim of duress, Porcelli obtained recordings of Schroeder's telephone calls from jail to Robertson, who was not in custody at that time. The calls revealed that Schroeder and Robertson had an amiable relationship, and consequently, Porcelli felt certain that Robertson was attempting to commit a fraud upon the court.

During Robertson's sentencing hearing, Robertson testified that Schroeder coerced him into committing the robbery. Porcelli then impeached Robertson with the phone recordings. Porcelli also withdrew the government's § 5K1.1 motion. The court continued the sentencing hearing to allow Robertson's counsel to review the phone calls. Robertson fired his first attorney and hired new attorneys.

Soon thereafter, one of Robertson's new attorneys, Dyril Flanagan ("Flanagan"), contacted Porcelli to say that Robertson had information relating to

---

[2] Porcelli was later appointed a U.S. magistrate judge in the Middle District of Florida.

3

"some murders." [R. 204 at 187.] Porcelli expressed his doubts about Robertson's offer but told Flanagan that Robertson could continue to cooperate pursuant to his existing plea agreement in the bank robbery case. Porcelli says that he never promised Robertson immunity in exchange for any of the information Robertson provided concerning the murders.

At Porcelli's direction, two FBI agents, Carl Cuneo ("Cuneo") and Jose Olivera ("Olivera"), met with Robertson and Flanagan at the jail where Robertson was in custody. Robertson told the agents that he was one of four men who had been together at the time two murders occurred. Robertson offered the agents the name of Charles Marovskis ("Marovskis") and claimed that Marovskis had violently beaten two homeless men to death with various weapons while Robertson watched. Robertson withheld more information from the agents until he could reach a deal with the government, and he requested protection for himself and his family. Flanagan and Porcelli communicated afterward about whether Robertson's provision of information would warrant the government's renewal of a § 5K1.1 motion in the bank robbery case.[3]

---

[3] Robertson alleges that there was a second meeting at the jail with Cuneo, Olivera, and Porcelli. Cuneo and Porcelli deny that a second meeting at the jail occurred. Robertson claims that at this second meeting, Porcelli offered him immunity in exchange for information. Robertson says that Olivera explained that the government could offer him protection akin to the protection provided to "Sammy the Bull," a notorious mobster who was not prosecuted for murders in exchange for his testimony against others. Robertson says his understanding of this

4

Without receiving a formal immunity agreement, Robertson and Flanagan met again with Agent Cuneo and a Tampa police task force agent at the FBI's downtown Tampa office. Porcelli did not attend the meeting. Robertson offered more information about the murders and discussed his and others' involvement with a local skinhead[4] group, Tampa Blood and Honour. Porcelli did not believe that Robertson's information was complete or entirely truthful, and he opened a federal investigation of the murders.

Meanwhile, in July 2003, the district court sentenced Robertson for bank robbery without the government's renewal of a § 5K1.1 motion for downward departure or any other reduction for acceptance of responsibility. By early 2005, Robertson had become a suspect in the federal murder investigations. The government indicted him and co-defendant Cory Hulse ("Hulse") in May 2008 for two counts of murder for the purpose of maintaining and increasing their positions in an enterprise engaged in racketeering activity, in violation of the violent crimes

---

sort of immunity deal is why he volunteered self-incriminating information about the murders to the government. In keeping with the U.S. Attorney's established policy against orally entering offers of immunity, Porcelli claims that he never orally extended any sort of immunity deal to Robertson.

[4] While there may be various groups who share "skinhead" identifying characteristics, we use the term as it was used by Tampa Blood and Honour members at trial to describe persons espousing neo-Nazi, white supremacist ideology.

5

in aid of racketeering ("VICAR") statute, 18 U.S.C. § 1959(a). Hulse pled guilty and agreed to testify against Robertson.

Robertson moved to dismiss the indictment with prejudice, arguing that the government procured the indictment against him by means of his immunized statements. At some point prior to the court's hearing on Robertson's motion to dismiss, Flanagan executed an affidavit in support of Robertson's assertion that there was an oral immunity deal, but Flanagan later rejected the affidavit. Robertson's trial counsel informed the court that Flanagan signed the document "inadvertently." [R. 206 at 15–16.] The district court held a hearing at which Robertson, Cuneo, and now-Magistrate Judge Porcelli testified. Cuneo admitted his notes reflected that the government and Flanagan were coordinating the details of a potential agreement. However, Porcelli denied he ever extended an immunity deal of any sort to Robertson. The district court declined to credit Robertson's testimony and denied his motion to dismiss the indictment. The case proceeded to trial.

B. *Jury selection*

While selecting the jury, Robertson moved to peremptorily strike three black venire members. He first moved to strike JMD, a male whose wife worked as a 911 operator and whose brother worked in some capacity with border patrol. The

6

government raised a *Batson* challenge, and the court asked Robertson to offer a race-neutral reason for the strike. Robertson pointed out JMD's connection to, and possible bias toward, law enforcement officers. The court sustained the *Batson* challenge and denied Robertson's request to strike JMD, finding that JMD could serve as an impartial juror. Later, Robertson also sought to peremptorily strike the remaining two black venire members, JWH, a male, and YT, a female.[5] The government again raised *Batson* challenges, and Robertson offered weak or incredible reasons for moving to strike both JWH and YT. The court denied Robertson's motions to strike JWH and YT because the court did not accept Robertson's proffered race-neutral reasons as sincere.

C. *Trial testimony*

Over the course of a nine-day trial, the three other participants in the murders, Ken Hoover ("Hoover"), Hulse, and Marovskis, as well as other Tampa Blood and Honour members, testified and established the following facts in the government's case against Robertson.

Blood and Honour is a white supremacist group that began in England for the purpose of protecting the "superior" race of white people. The group is part of the skinhead movement and espouses the teachings of Nazi Germany's Third

---

[5] The government's brief identifies the black female juror at issue as JB, but a review of the court's transcript makes it plain that Robertson moved to strike YT, not JB. [*Compare* Appellee's Br. at 12, *with* R. 207 at 365–69.]

7

Reich and Adolf Hitler.  Blood and Honour members consider non-white persons to be subhuman enemies who should be eliminated, or at least radically segregated and relocated away from whites.  The group views homeless people as degenerate and worthless to society.  They anticipate a future uprising of whites and a race war in the United States, and thus are inclined to prepare themselves for war.  The group's members thrive on proving themselves to one another by perpetrating violent acts against their rivals and enemies.

Jason Zinn, the U.S. leader of Blood and Honour, urged Justin Harrigan ("Harrigan") to create a Tampa chapter of Blood and Honour.  Harrigan included as members Hoover, Hulse, Marovskis, Robertson, and Jason Perfetti ("Perfetti").  To become a full member of the group, a person went through a probationary period as a "probate" until he proved himself to the group.  The group viewed Harrigan as its leader but held its regular meetings at Hoover's house.  The members accumulated weapons and ammunition, exchanged stories about violent things they had done, listened to skinhead music, and studied military tactics and white supremacist ideology.  The men all dressed similarly, obtained skinhead tattoos, and wore steel-toed boots for the purpose of inflicting additional injury and pain during fights.

8

On the night of Friday, September 11, 1998, Marovskis, Harrigan, Hoover, Robertson, Perfetti, and Steve McAlister ("McAlister") were at Hoover's house listening to skinhead music and drinking beer. Marovskis, Robertson, Harrigan, and McAlister left the house with Perfetti's pistol looking for street people, prostitutes, and drug dealers in order to "mess with" them. The men called this practice of terrorizing homeless people "bum rolling." Harrigan tried to shoot at a black man on a bicycle, but the gun failed to fire. They spotted a white prostitute on the street with a black man, pulled their car over to pretend to ask for directions, and sprayed the woman in the face with pepper spray before driving away, laughing. Robertson then drove the group to a bridge where a homeless man was known to stay. Robertson approached the man, who was apparently intoxicated, and began kicking and punching him. He and Marovskis continued to inflict a "boot party," kicking him with their steel-toed boots. McAlister chased the man into the river and continued to assault him. Before leaving the scene, Robertson threw a large chunk of rock or cinderblock and struck the man in the head.

Hoover and Hulse, who missed out on Friday night's events, drank throughout the day Saturday, September 12, with Marovskis and Robertson before heading out for another night of bum rolling. Robertson drove the group around town because he knew where to find vulnerable people. He took with him a three-

9

foot tire iron or crowbar with prongs on one end.[6]  The group spotted their first victim, Williams, a homeless black man, sitting on the front steps of a building in an industrial area.  As they approached, Williams tried to flee, but Robertson caught him and hit him over the head with the crowbar.  Williams fell to the ground screaming, but Robertson continued to beat him in the head, face, and upper torso.  The others gave Williams a "boot party" and hit him.  Before returning to the car, Robertson jabbed Williams in the eye with his weapon and bragged to the others that he had stabbed the man through the eye and into the brain.[7]

The four men had difficulty finding their next victim.  They stopped at Hoover's house for more beer, and while there, Hulse retrieved an axe.  Robertson then took the group to a wooded lot where he believed another homeless man lived.  This time, each of the men brought along a weapon—Robertson, the crowbar, Marovskis, a club, Hoover, a metal cane, and Hulse, the axe.  The four discovered their second victim, Arseneau, a homeless white man, sitting in a chair at an encampment in a clearing.  Arseneau attempted to run away, but as with Williams, Robertson stopped him by hitting Arseneau over the head with the

---

[6] Marovskis testified that Robertson had a pronged crowbar.  Hoover also described Robertson's weapon as a crowbar.  Hulse, however, testified that Robertson had a tire iron.

[7] A medical examiner testified that although Williams's eye had been hit, there was no penetration of the brain through the eye socket.

crowbar.  Hulse then hit Arseneau with the axe.  Arseneau fell to the ground screaming, and all four men continued to attack.  In the process, Hulse accidentally hit Hoover in the eye with the axe.  The group knew that they had killed Arseneau when they left the scene.

The group returned to Hoover's house.  Hoover removed his bloody shirt outside, and Marovskis washed it, ripped it up, and threw it away.  Hoover cleaned his eye while Robertson washed the weapons.  The next day, the men bragged to Harrigan about the two murders.  Harrigan told them to stop talking about it.  Robertson threw his and Hulse's weapons into a river.

Police found Williams's body on Sunday, September 13.  An autopsy revealed that he died from fractures to his cheeks, upper and lower jaws, bones around his eyes, and the base of his skull.  The same day, officers found Arseneau's body.  His autopsy revealed that he died as a result of cerebral bruising and lacerations to his head.

After these murders, Tampa Blood and Honour continued to initiate new members.  Hoover, Robertson, and Marovskis all got the same tattoos of spider webs to commemorate their participation in the killings.  The group continued to engage in violence, including attacks on homeless people.  In March 1999, another group member was charged with murdering a six-year-old mixed-race girl.  The

11

resulting investigation made the group members feel uneasy, and they disbanded and limited their contact with one another. At some point in time, Robertson suspected and accused Marovskis of telling the police about their involvement in the murders of Williams and Arseneau. After Robertson confronted and accused Marovskis, Marovskis was somewhat upset and confessed to William Folberth, another member of Tampa Blood and Honour, that he and the three other men had killed "some bums."

D. *Motion for judgment of acquittal, conviction, sentence, and appeal*

At the close of the government's case, Robertson moved for a judgment of acquittal, arguing that the government had not presented evidence that he committed murder for the purpose of maintaining or increasing his position in Tampa Blood and Honour. The court denied the motion.

On the basis of the testimony described above and other evidence, the jury found Robertson guilty on both counts of murder in aid of racketeering. The district court sentenced Robertson to two concurrent terms of life imprisonment, to be followed by two concurrent 60-month terms of supervised release, if he is ever released. Robertson appeals his convictions, arguing that: (A) the district court abused its discretion in denying his motion to dismiss the indictment; (B) the district court clearly erred in ruling to sustain the government's first *Batson*

12

challenge to Robertson's motion to strike JMD; and (C) the district court erroneously denied his motion for judgment of acquittal because the evidence was insufficient to show that he committed the murders for the purpose of maintaining or increasing his position within Tampa Blood and Honour.[8]

## II.

We review for abuse of discretion the denial of a motion to dismiss the indictment. *United States v. Wetherald*, 636 F.3d 1315, 1320 (11th Cir. 2011).

When reviewing the district court's ruling on *Batson* challenges, the court's determination "is entitled to great deference, and must be sustained unless it is clearly erroneous." *United States v. Hill*, 643 F.3d 807, 837–38 (11th Cir. 2011) (citing *Felkner v. Jackson*, ___U.S. ____, 131 S. Ct. 1305, 1307 (2011)).

We review *de novo* the denial of a motion for acquittal based on the sufficiency of the evidence, resolving all inferences and credibility choices in the government's favor. *United States v. Anderson*, 326 F.3d 1319, 1326 (11th Cir. 2003).

## III.

A. *Robertson's motion to dismiss the indictment*

---

[8] Robertson's court-appointed trial counsel filed an initial brief on Robertson's behalf, but at Robertson's request, the court-appointed attorney withdrew from the case to allow retained counsel to represent Robertson on appeal. We granted Robertson's substitute counsel leave to file a replacement appellant's brief. We rely on and discuss the arguments in the replacement brief.

13

Robertson claims that he received an oral immunity deal from the government in exchange for his assistance with the murder investigations, and therefore, he is entitled to immunity from prosecution for both murders. Robertson advances several arguments supporting the plausibility of his claim, including his contention that Flanagan disavowed the affidavit in support of Robertson's claim because Flanagan did not want to contradict the testimony of Porcelli, a magistrate judge. The district court, however, drew the opposite inference about Flanagan's denial of the affidavit's claims, finding that Flanagan's disavowal strongly indicated that there was in fact no immunity deal. [*See* R. 206 at 42 ("It is very clear in the mind of [Flanagan] that there was no immunity of any kind.").] Robertson also argues that Cuneo's notes, indicating cooperation between Porcelli and Flanagan, combined with Cuneo's testimony that Olivera "*might* have said something" at some point about offering Sammy the Bull-like immunity, [R. 204 at 156 (emphasis added)], support Robertson's understanding that he had an immunity deal. But ultimately, the district court found Porcelli and Cuneo's testimonies that there was no oral immunity deal to be more credible than Robertson's testimony. [*See* R. 206 at 42. ("[E]valuating . . . the consistency and inconsistency of the testimony that I've heard the Court believes that the motion[ to dismiss is] not well taken.").]

14

Hence, Robertson's arguments fail to convince us that the district court abused its discretion by denying his motion to dismiss the indictment. We must accept the district court's factual findings and credibility determinations as true unless the party seeking the motion can show they are clearly erroneous. *United States v. Ramirez-Chilel*, 289 F.3d 744, 749 (11th Cir. 2002). Robertson's testimony that there was an oral offer of immunity is in direct conflict with Porcelli and Cuneo's testimonies that there was never such an offer. The district court's acceptance of Porcelli and Cuneo's testimony over Robertson's "is conclusive on [this] court unless [we conclude that] the [district court] judge credit[ed] *exceedingly* improbable testimony." *Id.* Exceedingly improbable testimony is "contrary to the laws of nature, or . . . so inconsistent or improbable on its face that no reasonable factfinder could accept it." *Id.* Porcelli and Cuneo's testimony was neither inconsistent nor improbable. Thus, we affirm the district court's denial of Robertson's motion to dismiss the indictment.

B. *The government's first* Batson *challenge*[9]

Robertson argues that in sustaining the government's first *Batson* challenge, the district court (1) failed to require the government to make a prima facie showing of discrimination; (2) skipped step three of *Batson*'s analysis; and (3)

_____

[9] In Robertson's statement of the issues, he asserts that the court erroneously sustained two *Batson* challenges, but his actual argument addresses only the first *Batson* challenge involving JMD. *Compare* Appellant's Br. at v, *with id.* at 24–29.

15

improperly yielded to the government's purpose of ensuring that the jury panel included a black juror.

    1.  There was a prima facie showing of racial discrimination.

Pursuant to *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712 (1986) and its progeny, the district court must follow a three-part test to determine whether the striking party is discriminating on the basis of race. *United States v. Walker*, 490 F.3d 1282, 1291 (11th Cir. 2007). The party raising the *Batson* challenge must first make a prima facie showing that the striking party employed a peremptory challenge on the basis of race. *Id.* The court should consider "all relevant circumstances" supporting the challenging party's assertion of discrimination. *Batson*, 476 U.S. at 96–97, 106 S. Ct. at 1723. Relevant circumstances might include the striking party's "pattern" of striking venire members of a particular race, or making questions or statements during *voir dire* to members of a particular race that support the inference of a discriminatory purpose. *Id.* at 96–97, 106 S. Ct. at 1723. We have also reasoned that the subject matter of the case being tried—for instance, the prosecution of a racially motivated crime—is a relevant circumstance, *United States v. Stewart*, 65 F.3d 918, 925 (11th Cir. 1995), as are "the race and ethnicity of the defendant" and "the racial composition of the pool of

16

remaining potential jurors," *United States v. Allen-Brown*, 243 F.3d 1293, 1298 (11th Cir. 2001).

We have emphasized, as Robertson points out, that the district court should not require an explanation for a peremptory strike from the striking party unless and until the court is satisfied that the challenging party has made its prima facie case of discrimination.  *Cent. Ala. Fair Hous. Ctr., Inc. v. Lowder Realty Co.*, 236 F.3d 629, 636 (11th Cir. 2000); *Stewart*, 65 F.3d at 925 ("No party challenging the opposing party's use of a peremptory strike . . . is entitled to an explanation for that strike, much less to have it disallowed, unless and until a prima facie showing of racial discrimination is made.").  Robertson argues that the district court clearly erred in sustaining the government's *Batson* challenge to his first effort to peremptorily strike a black venire member, JMD, because, rather than requiring the government to establish a prima facie case of discrimination, the district court began with the second step of *Batson* and required Robertson to articulate race-neutral reasons for his first peremptory strike.

The government counters that it did present a prima facie case of racial discrimination and that the district court implicitly found that the government met its initial burden.  Appellee's Br. at 35–36 (citing *United States v. Campa*, 529 F.3d 980, 998 (11th Cir. 2008) ("We understand the district court to have ruled

17

implicitly that the defendants had made a prima facie showing of racial

discrimination because a district court cannot ignore the prima facie showing

requirement." (internal quotation marks omitted))).  The government further argues

Robertson's discriminatory motive is manifest because he later moved to

peremptorily strike the other two black venire members, JWH and YT.[10]  *See*

Appellee's Br. at 37 (citing *Lowder Realty Co.*, 236 F.3d at 637).  Robertson

replies that the government cannot point to the existence of a pattern of

discrimination at the time that Robertson attempted to strike JMD because JMD

was the first black juror that he attempted to strike.  The government submits, via

letter citing supplemental authority, that we should not ignore Robertson's

subsequent attempted strikes.  *See, e.g.*, *United States v. Charlton*, 600 F.3d 43, 54

(1st Cir. 2009) (consulting "all of the relevant circumstances that bear upon the

issue of racial animosity" when deciding whether the district court overlooked

evidence supporting a prima facie case); *Wade v. Terhune*, 202 F.3d 1190, 1198

---

[10] Robertson moved to peremptorily strike JWH because "[h]e ha[d] a brother who was a defendant in a criminal case." [R. 207 at 349–50.] Robertson again attempted to exercise a peremptory strike on a black female juror, YT, because, as a nursing assistant, YT might be biased against him based on her presumed sympathy for crime victims who suffer severe trauma. [*See* R. 207 at 365–68.] The court asked Robertson's counsel if he was serious; counsel conceded that the reason was weak. The following day, the government summarized, for the record, Robertson's three attempts to strike the three black venire members and the court's findings that Robertson's counsel's race-neutral reasons were bogus, to which the court responded, "That's correct." [R. 209 at 10.]

18

(9th Cir. 2000) (rejecting the premise that the time of the challenge is "the only relevant time" for the appellate court "to assess the would-be *prima facie* case").

We will not consider Robertson's subsequent motions to strike JWH and YT because there were relevant circumstances supporting an inference of discrimination at the time Robertson moved to strike JMD.[11]  At the moment the government objected to Robertson's motion to strike JMD, the record reflects that several "relevant circumstances" supported the inference that Robertson was discriminating against JMD on the basis of his race.  The district court was aware that (1) Robertson, a white defendant with white supremacist convictions, sought to strike a black venire person; (2) Robertson was on trial for committing a violent crime against a black victim; and (3) there were only three black potential jurors among the venire members.  Thus, without considering Robertson's subsequent attempts to strike the remaining black venire members for disingenuous reasons, we conclude that the district court had reason to suspect that Robertson's first peremptory strike was for a discriminatory purpose.

---

[11] Moreover, we do not agree with the government's assertion that we should look at subsequent events to substantiate the existence of a prima facie case at the time of the government's first *Batson* challenge.  We have reasoned that "*Batson* and its progeny prescribe an orderly step-by-step process for resolving issues involving allegations of racial discrimination in the use of peremptory strikes, and that process is linear, not circular."  *Stewart*, 65 F.3d at 925.  More specifically, we've said that "the prima facie case determination is the self-contained, first step in a one-direction process, which is not affected by events or determinations that occur thereafter."  *Id.* at 925–26.  Hence, we consider the relevant circumstances existing at the time of the first *Batson* challenge.

Although the court did not elaborate on how the government met its burden at step one, the district court's prima facie finding was implicit. *See Campa*, 529 F.3d at 998; *Allen-Brown*, 243 F.3d at 1298 (reasoning that although "[t]he trial judge *did not elaborate on the reasons* for his suspicion that the Constitutional rights of the prospective jurors potentially excluded from the jury on the basis of race were being violated[, t]he totality of the circumstances . . . was sufficient to allow the district court to conclude that the first *Batson* step was met" (emphasis added)); *cf. Greene v. Upton*, 644 F.3d 1145, 1155 (11th Cir. 2011) (reasoning that *"Batson* does not require elaborate factual findings," and therefore holding that a trial court's ultimate ruling on a *Batson* challenge is itself a finding of fact as to whether the striking party discriminated in violation of *Batson*).  Moreover, because *Batson* "compels the trial court to act if it has a reasonable suspicion that Constitutional rights are being violated in its presence," *Allen-Brown*, 243 F.3d at 1298, and because the district court is in the better position to assess the *Batson* challenge, we give deference to the district court's implicit prima facie finding of discrimination.

> 2.  The district court properly exercised its discretion to reject Robertson's race-neutral reason and sustain the *Batson* challenge.

Once the district court is satisfied that the challenging party has shown a prima facie case of discrimination, the court proceeds to step two, requiring the

20

striking party to offer a race-neutral reason for employing his peremptory strike. *Walker*, 490 F.3d at 1291.  Finally, in the third step, the district court must decide, in light of both parties' representations, whether the challenging party persuasively demonstrated the striking party's discriminatory motive.  *Id.*

Robertson contends that the district court improperly rejected his plausible reason for striking JMD.  Robertson also argues that the district court failed to continue to the third step of *Batson* and "conflated the final two steps" by deciding that Robertson's proffered reason was not a good enough reason to strike JMD. Reply Br. at 3.  Robertson argues that even if the district court had properly followed the three-step *Batson* challenge process, it lacked grounds to sustain the government's challenge to JMD because Robertson offered a plausible reason for the strike and had yet to exercise a peremptory strike on a black juror.

Robertson's claim that the district court procedurally erred and conflated the second and third steps of *Batson* is without merit.  The court asked Robertson to proffer a race-neutral reason for the strike, satisfying step two of *Batson*.  Then, apparently persuaded that Robertson's strike was racially motivated, the court denied his motion to strike, satisfying step three.  *Cf. Hightower v. Terry*, 459 F.3d 1067, 1072 n.9 (11th Cir. 2006) ("We may . . . make the common sense judgment—in light of . . . the trial court's ultimate ruling—that the trial court

21

implicitly found the [striking party]'s race-neutral explanations to be credible, thereby completing step three of the *Batson* inquiry." (internal quotation marks omitted)).

As for Robertson's argument that his proffered race-neutral reason was sincere, he cannot demonstrate that the district court clearly erred in sustaining the government's *Batson* challenge. As fact-finder and judge of credibility, the court had great discretion to accept Robertson's race-neutral reason as truth or to reject it as pretext. *See Walker*, 490 F.3d at 1291 (explaining that "the district court's determination concerning the actual motivation behind each challenged strike amounts to pure factfinding, and we will reverse only if the decision is clearly erroneous").[12] Thus, we defer to the district court's determination that Robertson attempted to strike JMD for a discriminatory purpose.

> 3. The district court's ruling was not tainted by an improper attempt to seat black persons on the jury.

Finally, Robertson asserts that the district court improperly "acquiesce[d] to the [g]overnment's demand that the court impose a racial quota on the composition

_____

[12] Moreover, while the district court did not articulate exactly why Robertson's reason was not persuasive, we note that Robertson did not attempt to strike several other venire persons with JMD's allegedly race-neutral, objectionable quality—a connection to law enforcement officers. This supports the inference that Robertson's proffered race-neutral reason was pretextual. *See Miller-El v. Dretke*, 545 U.S. 231, 241, 125 S. Ct. 2317, 2325 (2005) ("If a [striking party]'s proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step.").

of the jury," and therefore, ruled against him to ensure that a black person was included on the panel. Appellant's Br. at 27. Robertson points to the prosecutor's response to his race-neutral reason for striking JMD. The prosecutor said,

> Your Honor, I don't think that sounds like a plausible reason given the responses of the other jurors.[13] *It's concerting [sic] to me that this case involves a black victim and white supremacy. I do not want to see a juror [sic] without a black juror unless it's for a good reason.*

[R. 207 at 341 (emphasis added).] The court then denied Robertson's motion to strike JMD, remarking "I think [JMD] has a right to be here. He said he could be fair and impartial. And I don't think [Robertson's proffered reason i]s a basis to knock him out of this jury." [*Id.* at 342.]

Robertson is correct that one's race is unrelated to his or her fitness as a jury member. *See Batson*, 476 U.S. at 87, 106 S. Ct. at 1718 ("Competence to serve as a juror ultimately depends on an assessment of individual qualifications and ability impartially to consider evidence presented at a trial.") Even if the government expressed its own improper motive to empanel black jurors on the basis of their race, which was mixed with its proper motive of protecting JMD's constitutional right to serve as a juror, the court's ruling in the government's favor does not mean

---

[13] Here, the government alluded to Robertson's failure to strike several jurors who shared JMD's objectionable connection to, and presumed sympathy for, law enforcement officers. Robertson declined to strike: a juror whose brother was a retired law enforcement officer; a juror whose brother was a corrections officer; another juror whose family member worked as a prison guard; a juror employed as a security guard; and a juror who formerly served as a deputy sheriff.

23

that the court embraced the government's improper motive.  There is no evidence that the district court improperly denied Robertson's motion to strike because the court was attempting to ensure that the jury included blacks.  The record reflects only the court's unobjectionable remarks that JMD had a right to serve as a juror, and that JMD assured the court that he could be impartial.  Robertson has not shown that the district court "acquiesced" to anything improper.

In summary, we conclude that the district court did not clearly err in sustaining the government's *Batson* challenge to Robertson's motion to strike JMD.

### C.  *Robertson's motion for judgment of acquittal*

Robertson argues that the government presented no credible evidence that he participated in the two murders for the purpose of maintaining or increasing his status as a member of Tampa Blood and Honour.  Robertson first asserts that the government could not prove his participation in the murders without the testimonies of Hulse, Hoover, and Marovskis, who all testified against him in order to avoid the death penalty or life imprisonment.  Robertson claims that their credibility is further weakened by their intoxication at the time of the killings and the inconsistencies among their stories.  The jury was given the opportunity to consider the weight of these same arguments, and we "resolve all . . . credibility

24

evaluations in favor of the jury's verdict[s]." *United States v. Siegelman*, 640 F.3d 1159, 1179 (11th Cir. 2011) (internal quotation marks omitted). Hence, Robertson's criticism of the government's witnesses is unavailing.

Robertson also contends that the government failed to prove that his participation in the murders was for the purpose of maintaining or increasing his position within Tampa Blood and Honour. The VICAR statute under which Robertson was convicted on both counts provides that

> [w]hoever, . . . for the purpose of . . . maintaining or increasing position in an enterprise engaged in racketeering activity, murders . . . any individual in violation of the laws of any State or the United States, . . . shall be punished . . . by death or life imprisonment.

18 U.S.C. § 1959(a)(1). The statute does not define "for the purpose of . . . maintaining or increasing position in an enterprise." To interpret this language, the court in *United States v. Concepcion*, 983 F.2d 369 (2d Cir. 1992), relied upon legislative history indicating that Congress intended to criminalize violent acts committed "*as an integral aspect of membership*" in a racketeering enterprise. *Id.* at 381 (emphasis added) (quoting S. REP. NO. 225, at 304 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, at 3483). Other courts have construed the VICAR statute the same way. *See, e.g.*, *United States v. Tse*, 135 F.3d 200, 206 (1st Cir. 1998); *United States v. Fiel*, 35 F.3d 997, 1004 (4th Cir. 1994). Therefore, "[t]he motive element" of each VICAR murder charge "is satisfied if the jury could properly

25

infer that [Robertson] committed [murder] because he knew it was expected of him by reason of his membership in [Tampa Blood and Honour] or that he committed [murder] in furtherance of that membership." *United States v. Whitten*, 610 F.3d 168, 178–79 (2d Cir. 2010) (alterations and internal quotation marks omitted).

At trial, the government established that Tampa Blood and Honour existed to fight for and promote white supremacy and that the group had a goal of eliminating "inferior" people—in their view, blacks and the homeless, among others. Testimony further established that violence was a part of the group's culture, and that the group expected its members to demonstrate loyalty by engaging in violent acts.[14] Specifically, the day after committing the murders, Robertson, Hoover, Hulse, and Marovskis reported what they had done to Harrigan, their leader, in order "to brag to him" and to "prove" themselves to him. [R. 215 at 89.] Robertson and other group members also got tattoos commemorating their participation in the killings. These facts are sufficient to

---

[14] For example, Marovskis described getting in fights and inflicting a boot party as "kind of like a right [sic] of passage . . . in a lot of ways." [R. 215 at 21.] He said that when a member told the group about his experiences fighting, "it was to prove to other people . . . the things that [he]'d done." [*Id.* at 25.] When asked what a Blood and Honour member had to do to prove his loyalty to the group, Marovskis answered: "You had to show your loyalty through violence[.]" [*Id.* at 24.] Likewise, Hulse confirmed that "[t]here was definitely peer pressure to join in [the violence] and some harassment if you did not." [R. 214 at 130.] Marovskis further testified about their fighting as follows: "[W]e all kind of looked at it as . . . almost like training—you know . . . toughing up . . . training for [a future race or class] war." [R. 215 at 91.] This and other testimony indicate that Robertson and others participated in violent acts, like the murders, not only as an expression of the group's ideology, but also in an effort to prove themselves and their commitment to the group and its purposes.

26

prove Robertson's motive and sustain his convictions under 18 U.S.C.

§ 1959(a)(1). *See, e.g.*, *Fiel*, 35 F.3d at 1005 (reasoning that a group's ultimatum to members to either fight or leave a group supported the rational inference that defendants' violent activity was expected of them by reason of their membership in their group); *United States v. Smith*, 413 F.3d 1253, 1278 (10th Cir. 2005) (rejecting a challenge to the sufficiency of the evidence because the government presented testimony that "acts of violence were a common part of [the defendant's gang]'s culture," that the gang's "members were expected to retaliate against acts of violence committed on fellow members," and that the members "felt pressure to live up to" their reputations within the group), *abrogated on other grounds by United States v. Hutchinson*, 573 F.3d 1011 (10th Cir. 2009).

Robertson also argues that Hoover, Hulse, and Marovskis's testimonies contradict the government's theory that Robertson intended to maintain or advance his position in Tampa Blood and Honour by committing the murders. He points out testimony that Harrigan, the group leader, was unimpressed when informed about the killings, and that the group members dissociated themselves from one another not long after the murders. The defendant in *United States v. Farmer*, 583 F.3d 131 (2d Cir. 2009), a gang member, made a similar argument that his gang did not condone his mistaken killing of an innocent person wearing rival gang

27

colors, and in fact, he had to dissociate himself from his gang after the murder. *Id.* at 142. Yet the court rejected that argument, reasoning that "the question is not whether Farmer's position in the Bloods was advanced in fact by the murder he committed, but whether *his purpose* in committing the murder was to benefit his position." *Id.* (emphasis added). Likewise, it does not matter whether Harrigan approved of the murders, or whether Tampa Blood and Honour thrived or failed. What matters is whether the testimony supports the inference that Robertson, at the time of the murders, was motivated to kill others in order to bolster his credibility as a member of the group. Indeed, the government's evidence supports that inference.

Because the government produced sufficient evidence to support the jury's reasonable finding that Robertson murdered Williams and Arseneau "for the purpose of . . . maintaining or increasing [his] position" in Tampa Blood and Honour, 18 U.S.C. § 1959(a), we hold that the district court properly denied Robertson's motion for judgment of acquittal.

IV.

For the foregoing reasons, we affirm Robertson's convictions.

**AFFIRMED.**

28

JORDAN, Circuit Judge, concurring.

Except as to the discussion and resolution of the *Batson* claim, I join the majority opinion. As to the *Batson* claim, I concur in the judgment. Although the district court initially (and improperly) appeared to use the cause standard when sustaining the government's *Batson* challenge to the defense's peremptory strike of JMD, *see* Trial Transcript [D.E. 207] at 342, it later confirmed, *see* Trial Transcript [D.E. 209] at 10, that it did not believe that defense counsel's proffered reason for the strike of JMD was genuine. On this record, that finding of pretext was not clearly erroneous.

29